**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE**

|  |  |  |
|---|---|---|
| CANADIAN SOLAR INTERNATIONAL LIMITED; CANADIAN SOLAR MANUFACTURING (THAILAND) CO., LTD.; CANADIAN SOLAR US MODULE MANUFACTURING CORPORATION; AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE; TRINA SOLAR SCIENCE & TECHNOLOGY (THAILAND) LTD.; and M.L.T. SOLAR ENERGY PRODUCT CO., LTD., | ) ) ) ) ) ) ) ) ) ) ) |  |
| Plaintiffs and Consolidated Plaintiffs, | ) ) ) |  |
| v. | ) ) | Consol. Ct. No. 25-159 |
| UNITED STATES, | ) ) |  |
| Defendant, | ) ) ) |  |
| and, | ) ) ) |  |
| AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE, | ) ) ) |  |
| Defendant-Intervenor. | ) ) |  |

**ORDER**

Upon consideration of the motion of Plaintiffs Trina Solar Science & Technology (Thailand) Ltd. and M.L.T. Solar Energy Product Co., Ltd. for judgment on the agency record pursuant to Rule 56.2 of the Rules of this Court, and all other papers and proceedings herein; it is hereby:

**ORDERED** that Plaintiffs' motion is hereby granted; and it is further

**ORDERED** that the final determination with respect to *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from Thailand: Final Affirmative Determination*

*of Sales at Less-Than-Fair-Value and Final Affirmative Determination of Critical Circumstances*, 90 Fed. Reg. 17,395 (Dep't Commerce Apr. 25, 2025), is hereby remanded to the U.S. Department of Commerce ("Commerce") with instructions to take such further action as required by the Court's decision in this matter.

By:    _____
Gary S. Katzmann, Judge

Dated: _____
New York, New York

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| CANADIAN SOLAR INTERNATIONAL LIMITED; CANADIAN SOLAR MANUFACTURING (THAILAND) CO., LTD.; CANADIAN SOLAR US MODULE MANUFACTURING CORPORATION; AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE; TRINA SOLAR SCIENCE & TECHNOLOGY (THAILAND) LTD.; and M.L.T. SOLAR ENERGY PRODUCT CO., LTD.,<br><br>Plaintiffs and Consolidated Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and,<br><br>AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE,<br><br>Defendant-Intervenor. | Consol. Ct. No. 25-159<br><br>**NON-CONFIDENTIAL VERSION**<br><br>Business proprietary information has been redacted on pages 2, 4–6, 8–10, 15, 19, 22, 24–26, 28–29, 36–39, 41, and 45. |

**PLAINTIFFS' MOTION FOR JUDGMENT ON THE**
**AGENCY RECORD PURSUANT TO RULE 56.2**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiffs

Trina Solar Science & Technology (Thailand) Ltd. ("TTL") and M.L.T. Solar Energy Product

Co., Ltd. ("MLT," collectively "Plaintiffs") hereby move for judgment on the agency record with

respect to their complaint challenging the final determination of the antidumping duty

investigation by the U.S. Department of Commerce ("Commerce") in *Crystalline Silicon*

*Photovoltaic Cells, Whether or Not Assembled Into Modules, from Thailand: Final Affirmative*

*Determination of Sales at Less-Than-Fair-Value and Final Affirmative Determination of Critical*

*Circumstances*, 90 Fed. Reg. 17,395 (Dep't Commerce Apr. 25, 2025) ("*Final Determination*")

P.R. 451, and accompanying Issues and Decision Memorandum (Apr. 18, 2025) ("IDM"), P.R.

448; *see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules*

*from the Socialist Republic of Vietnam: Amended Final Antidumping Duty Determination;*

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from Cambodia,*

*Malaysia, Thailand, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 90 Fed.

Reg. 26,786 (Dep't Commerce June 24, 2025), P.R. 460; *Crystalline Silicon Photovoltaic Cells,*

*Whether or Not Assembled Into Modules From the Socialist Republic of Vietnam: Amended*

*Final Antidumping Duty Determination; Crystalline Silicon Photovoltaic Cells, Whether or Not*

*Assembled Into Modules From Cambodia, Malaysia, Thailand, and the Socialist Republic of*

*Vietnam: Antidumping Duty Orders; Correction*, 90 Fed. Reg. 29,843 (July 7, 2025), P.R. 462.

Plaintiffs respectfully move, pursuant to Rule 56.2, for the reasons explained in the

accompanying Memorandum, for this Court to hold that the contested portions of the *Final*

*Determination* are unsupported by substantial evidence and otherwise not in accordance with

law.  Plaintiffs further move for this Court to remand this matter to Commerce for disposition

consistent with the order and opinion of the Court.

<div style="margin-left: 45%;">

Respectfully submitted,

/s/ Jonathan M. Freed
Jonathan M. Freed
MacKensie R. Sugama
**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, DC 20003
(202) 223-3760
jfreed@tradepacificlaw.com

</div>

Dated:  May 11, 2026               Counsel for Plaintiffs *Trina Solar Science &*
                                   *Technology (Thailand) Ltd. and M.L.T. Solar*
                                   *Energy Product Co., Ltd.*

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| CANADIAN SOLAR INTERNATIONAL LIMITED; CANADIAN SOLAR MANUFACTURING (THAILAND) CO., LTD.; CANADIAN SOLAR US MODULE MANUFACTURING CORPORATION; AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE; TRINA SOLAR SCIENCE & TECHNOLOGY (THAILAND) LTD.; and M.L.T. SOLAR ENERGY PRODUCT CO., LTD., | ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs and Consolidated Plaintiffs, | ) ) |
| v. | )  Consol. Ct. No. 25-159 )  |
| UNITED STATES, | )  **NON-CONFIDENTIAL** )  **VERSION** |
| Defendant, | )  )  Business proprietary |
| and, | )  information has been )  redacted on pages 2, 4–6, |
| AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE, | )  8–10, 15, 19, 22, 24–26, )  28–29, 36–39, 41, and 45. )  |
| Defendant-Intervenor. | )  )  |

**MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT UPON THE AGENCY
RECORD OF PLAINTIFFS TRINA SOLAR SCIENCE & TECHNOLOGY
(THAILAND) LTD. AND M.L.T. SOLAR ENERGY PRODUCT CO., LTD.**

Jonathan M. Freed
MacKensie R. Sugama
**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, DC 20003
(202) 223-3760
jfreed@tradepacificlaw.com

*Counsel for Trina Solar Science & Technology
(Thailand) Ltd. and M.L.T. Solar Energy
Product Co., Ltd.*

Dated: May 11, 2026

NON-CONFIDENTIAL VERSION

**TABLE OF CONTENTS**

STATEMENT PURSUANT TO RULE 56.2(C)..................................................................... 1

    A.    Administrative Determination Under Review...................................... 1

    B.    Issues Presented............................................................................... 1

STATEMENT OF FACTS ................................................................................ 3

STANDARD OF REVIEW .............................................................................. 7

ARGUMENT.................................................................................................... 8

I.    COMMERCE'S ADJUSTMENT UNDER THE MAJOR INPUT RULE BASED ON THAI IMPORT DATA UNDER HTS 3818.00 WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW ................................................... 8

    A.    Legal and Factual Background................................................... 8

    B.    Commerce's Reliance on Thai Imports Under HTS 3818.00 for Valuing TTL's Wafer Input Market Price was Unreasonable.......................... 10

        i.    The Thai Import Data under HTS 3818.00 was Unreliable as a Benchmark for Valuing Solar Wafers ................................................ 11

        ii.    Commerce's Selection of a Benchmark Market Price was Abberational and Unsupported by Substantial Evidence ......................... 15

    C.    Commerce's Failure to Consider Alternative Benchmark Sources for Solar Wafer was Unreasonable ................................................. 16

II.    COMMERCE'S FINDING OF A PMS IN THAILAND FOR SOLAR WAFERS IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE ................................................. 19

    A.    Legal Background ................................................................ 20

    B.    Factual Background............................................................... 21

    C.    Commerce's Finding of a PMS in Thailand is Unsupported by the Record Because TTL did not use Chinese Polysilicon ................................. 23

    D.    Commerce's PMS Finding Lacks a Basis for Finding Any Market Situation "Particular"............................................................................. 26

    E.    Commerce's Benchmark Selection Used to Conclude that a Cost-Based PMS Distortion Exists in Thailand is Unsupported by Substantial Evidence................. 28

III.    COMMERCE'S FINDING OF A PMS IN THAILAND FOR SOLAR GLASS IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE ......................................................... 35

    A.    Factual Background................................................................ 36

    B.    Commerce's Finding of a PMS Distortion for Solar Glass in Thailand is Unsupported by the Record ................................................. 38

    C.    Commerce's Reliance on Eurostat Data under HTS 7007.19.80 as a Solar Glass Benchmark was Unreasonable ................................................. 39

**NON-CONFIDENTIAL VERSION**

CONCLUSION ......................................................................................................................... 45

# TABLE OF AUTHORITIES

### CASES

*Ad Hoc Shrimp Trade Action Committee v. United States*, 219 F.Supp.3d 1286 (Ct. Int'l Trade 2017) ................................................................................................................... 17

*Albemarle Corp. v. U.S.*, 931 F.Supp.2d 1280 (Ct. Int'l Trade 2013) ......................................... 42

*Albemarle Corp. v. United States*, 821 F.3d 1345, 1353 (Fed. Cir. 2016) .................................. 25

*An Giang Fisheries Import and Export Joint Stock Company v. United States*, 179 F.Supp.3d 1256 (Ct. Int'l Trade 2016) ..................................................................................................... 16

*Best Mattress International Co. Ltd. v. United States*, 622 F.Supp.3d 1347 (Ct. Int'l Trade 2023) ................................................................................................................................................ 9

*Bosun Tools Co., Ltd. v. United States*, 2022 WL 94172 (Fed. Cir. Jan 2022) ........................... 25

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) .............................................. 7

*Changzhou Trina Solar Energy Co. v. United States*, 466 F.Supp.3d 1295 (Ct. Int'l Trade 2020) ................................................................................................................................................ 43

*Daewoo Elecs. Co. v. Int'l Union of Elec., Tech., Salaried & Mach. Workers, AFL-CIO*, 6 F.3d 1511 (Fed. Cir. 1993) ............................................................................................................... 7

*Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262 (Ct. Int'l Trade 2006) ............................... 16

*Fuwei Films (Shandong) Co., Ltd. v. U.S.*, 837 F.Supp.2d 1347 (Ct. Int'l Trade 2012) .............. 16

*Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319 (Fed. Cir. 2010) ......................... 7

*Horner v. Jeffrey*, 823 F.2d 1521 (Fed. Cir. 1987) ...................................................................... 45

*Husteel Co. v. United States*, 426 F. Supp. 3d 1376 (Ct. Int'l Trade 2020) ................................ 27

*Hyundai Steel Co. v. United States*, 19 F.4th 1346 (Fed. Cir. 2021) ........................................... 27

*Mittal Steel Galati S.A. v. United States*, 502 F. Supp. 2d 1295 (Ct. Int'l Trade 2007) .............. 16

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)... 7

*Nation Ford Chern. Co. v. United States*, 166 F.3d 1373 (Fed. Cir. 1999) ................................. 15

*Neimenggu Fufeng Biotechnologies Co. v. United States*, 816 F.Supp.3d 1356 (Ct. Int'l Trade 2026) ................................................................................................................................... 44

*NEXTEEL Co. v. United States*, 28 F.4th 1226 (Fed. Cir. 2022) ................................................. 27

*NEXTEEL Co. v. United States*, 633 F. Supp. 3d 1190 (Ct. Int'l Trade 2023) ............................ 27

*N.L.R.B. v. Columbian Enameling & Stamping Co.*, 306 U.S. 292 (1939) .................................. 7

*NMB Sing. Ltd.* v. *United States*, 557 F.3d 1316 (Fed. Cir. 2009) .................................................. 8

*Nucor Corporation v. United States*, 461 F. Supp. 3d 1374 (Ct. Int'l Trade 2020) ....................... 8

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990) ........................................ 45

*Shakeproof Assembly Components v. United States*, 268 F.3d 1376 (Fed. Cir. 2001) ................. 17

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001) .................................................. 32

*SKF USA Inc. v. United States*, 630 F.3d 1365 (Fed. Cir. 2011) .................................................. 17

*Stein Industries Inc. v. United States*, 365 F. Supp. 3d 1364 (Ct. Int'l Trade 2019) ..................... 8

*Taian Ziyang Food Co., Ltd. v. U.S.*, 783 F.Supp.2d 1292 (Ct. Int'l Trade 2011) ................. 35, 44

*Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474 (1951) ....................................................... 7, 17

*Vicentin S.A.I.C. v. United States*, 404 F.Supp.3d 1323 (Ct. Int'l Trade 2019) .......................... 19

*Wilmar Trading Pte Ltd. v. United States*, 675 F.Supp.3d 1215 (Ct. Int'l Trade 2023)... 21, 26, 39

*Zhengzhou Harmoni Spice Co., Ltd. v. U.S.*, 617 F.Supp.2d 1281 (Ct. Int'l Trade 2009) ........... 44

**STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i) ........................................................................................................ 7

19 U.S.C. § 1677b(f)(3) .................................................................................................. 4, 8, 9, 18

19 U.S.C. § 1677b(e) .................................................................................................................. 20, 26

19 U.S.C. § 1677f(i)(3)(A) ............................................................................................................ 8

**REGULATIONS**

19 C.F.R. § 351.407(b) ................................................................................................................. 9

19 C.F.R. § 351.416 ...................................................................................................................... 21

19 C.F.R. § 351.416(d) .......................................................................................... 5, 21, 30, 32, 43

19 C.F.R. § 351.416(e) ................................................................................................................. 26

**ADMINISTRATIVE MATERIALS**

*Antidumping Duties, Countervailing Duties*, 62 Fed. Reg. 27,296 (May 19, 1997) (Final Rule) ................................................................................................................. 16

*Circular Welded Carbon Steel Pipes and Tubes from Thailand:  Final Results of Antidumping Duty Administrative Review; 2016-2017*, 83 Fed. Reg. 51,927 (Oct. 15, 2018) ...................... 20

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Malaysia: Affirmative Preliminary Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 96,207 (Dec. 4, 2024) ................................................................................................... 32

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2016–2017*, 83 Fed. Reg. 67,222 (Dec. 28, 2018) ..................................................................................................... 13

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017-2018*, 85 Fed. Reg. 7,531 (Feb 10, 2020) ...................................................................................................... 13

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Results of the Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 79,163 (Dec. 9, 2020) ................................................................ 43

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Preliminary Results of the Countervailing Duty Administrative Review, and Recission in Part; 2018*, 86 Fed. Reg. 21,691 (Apr. 23, 2021)............................ 43

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 40,491 (Jul. 7, 2022) ........................................... 43

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Preliminary Results of the Countervailing Duty Administrative Review, and Recission in Part; 2020*, 88 Fed. Reg. 1,355 (Jan. 10, 2023)............................... 42

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Preliminary Results of the Countervailing Duty Administrative Review, and Recission in Part; 2021*, 88 Fed. Reg. 88,575 (Dec. 22, 2023)............................ 42

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from Thailand: Final Affirmative Determination of Sales at Less-Than-Fair-Value and Final Affirmative Determination of Critical Circumstances*, 90 Fed. Reg. 17,395 (Apr. 25, 2025)................... 1, 6

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Thailand: Preliminary Affirmative Determination of Sales at Less-Than-Fair-Value, Affirmative*

**NON-CONFIDENTIAL VERSION**

*Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 89 Fed. Reg. 96,214 (Dec. 4, 2024), P.R. 367 .................. 4

*Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 89 Fed. Reg. 20,831 (Mar. 25, 2024) ............................................................................................................... 20, 21

## MEMORANDUM IN SUPPORT OF MOTION FOR
## JUDGMENT UPON THE AGENCY RECORD

Plaintiffs, Trina Solar Science & Technology (Thailand) Ltd. ("TTL"), and M.L.T. Solar

Energy Product Co., Ltd. ("MLT," collectively, "Plaintiffs") hereby submit this Memorandum of

Points and Authorities in Support of their Motion for Judgment on the Agency Record in

accordance with Rule 56.2(c) of the Rules of this Court.[1]  Plaintiffs respectfully request that the

Court reverse the challenged determination of the U.S. Department of Commerce ("Commerce"),

and remand with instructions consistent with this Memorandum.

## STATEMENT PURSUANT TO RULE 56.2(C)

### A.    Administrative Determination Under Review

This action is an appeal from Commerce's affirmative determination of its antidumping

duty investigation in *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into*

*Modules, from Thailand: Final Affirmative Determination of Sales at Less-Than-Fair-Value and*

*Final Affirmative Determination of Critical Circumstances,* 90 Fed. Reg. 17,395 (Apr. 25, 2025)

("*Final Determination*"), P.R. 451, and accompanying Issues and Decision Memorandum (Apr.

18, 2025) ("IDM"), P.R. 448.  *See also Crystalline Silicon Photovoltaic Cells, Whether or Not*

*Assembled Into Modules From the Socialist Republic of Vietnam: Amended Final Antidumping*

*Duty Determination; Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into*

*Modules From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam:*

*Antidumping Duty Orders; Correction,* 90 Fed. Reg. 29, 843 (July 7, 2025), P.R. 462.

### B.    Issues Presented

**I.    Whether Commerce's adjustment under the Major Input Rule of TTL's wafer costs
based on an unspecific benchmark price was in accordance with substantial**

---

[1] Plaintiffs have decided not to seek relief with regard to Count Six of their Complaint. *See* Compl., Aug. 25, 2025, ECF Doc. No. 9 (25-166).

1

**evidence when such adjustment reflected a 352% increase from TTL's wafer purchases?**

No. Commerce unlawfully applied an adjustment under the Major Input Rule by relying on unspecific, overbroad Thai import data under HTS 3818.00. The import data under this classification was comprised of goods that were non-comparable, non-silicon products, from non-solar wafer producing countries. In selecting such an unrepresentative benchmark to value TTL's affiliated wafer purchases, Commerce unreasonably increased TTL's wafer cost by 352 percent. Finally, Commerce erred by failing to weigh or consider any alternative, and far more specific and reliable, sources on the record.

**II.    Whether Commerce's finding of a cost-based "particular market situation" ("PMS") in Thailand for solar wafers was supported by substantial evidence?**

No. Commerce's determination that a cost-based PMS exists for solar wafers in Thailand is unsupported by substantial evidence and relies on inherently circular reasoning. First, Commerce entirely ignoring uncontroverted record evidence that TTL—accounting for over [    ] percent of subject Thai exports—consumed exclusively premium [        ] polysilicon. Second, Commerce itself created a market distortion by selecting an overbroad tariff basket category that yielded an aberrational benchmark price. Because Commerce ignored TTL's actual supply chain and relied on a nonspecific baseline to justify its adjustment, Commerce's PMS determination is contrary to law and cannot be sustained.

**III.    Whether Commerce's finding of a cost-based PMS in Thailand for solar glass was supported by substantial evidence?**

No. Commerce's cost-based PMS finding for solar glass in Thailand is unsupported by substantial evidence. Commerce's determination entirely ignores that [    ] percent of TTL's solar glass inputs were sourced from non-China and non-Thai markets — directly undermining Commerce's premise that Chinese dominance distorted TTL's input costs. Similar to its PMS

2

finding for solar wafers, Commerce's distortion finding suffers from circular reasoning—rather than identifying a genuine market distortion, Commerce created one by selecting an overinclusive benchmark under HTS 7007.19.80 — a broad basket category covering cell phone screens, automobile glass, and appliance glass — with average prices four to five times higher than prices specific to solar glass.  Product-specific benchmarks on the record, including PV Insights pricing data and Turkish import data specific to 2-3.2mm solar glass, all yielded prices closely aligned with TTL's actual solar glass costs, confirming that no distortion existed. Commerce's rejection of these superior sources cannot be sustained as reasonable or in accordance with law.

## <u>STATEMENT OF FACTS</u>

On April 24, 2024, the American Alliance for Solar Manufacturing Trade Committee ("Petitioner") filed a petition for the imposition of antidumping duties on imports of crystalline silicon photovoltaic ("CSPV") cells from Cambodia, Malaysia, Thailand, and Vietnam, as well as the imposition of countervailing duties on imports of solar cells from the same countries.  *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 89 Fed. Reg. 43,809 (May 20, 2024), P.R. 60.  On May 14, 2024, Commerce initiated an antidumping duty investigation against CSPV cells from Thailand, with the period of investigation ("POI") covering April 1, 2023, through March 31, 2024.  *Id.*  On June 21, 2024, Commerce released its respondent selection memorandum stating that it had selected TTL as the sole mandatory respondent for Thailand.  *See* Commerce Memorandum, "Respondent Selection Memo," (June 21, 2024) ("Respondent Selection Memo"), P.R. 143, C.R.

3

39. While not selected as a mandatory respondent, as a producer and exporter of subject merchandise, MLT received the "all others" rate for non-examined companies.

On September 19, 2024, the Petitioner filed an allegation that a cost-based Particular Market Situation ("PMS") existed in Thailand as a result of non-market economy inputs purchased by TTL from China. *See* "Alliance's Allegations of a Cost-Based Particular Market Situation Affecting Thailand," (Sept. 19, 2024), P.R. 216, C.R. 65. ("PMS Allegation"). Among the variety of inputs alleged to be distortive, the Petitioner's cost-based PMS allegation relating to solar wafer and glass are relevant to this appeal. Over the next several months, interested parties submitted comments and benchmark information for the purposes of valuing solar wafer and glass for the alleged cost-based PMS.

On December 4, 2024, Commerce published its Preliminary Determination in the Federal Register. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Thailand: Preliminary Affirmative Determination of Sales at Less-Than-Fair-Value, Affirmative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 89 Fed. Reg. 96,214 (Dec. 4, 2024), P.R. 367 ("*Preliminary Determination*"); *see also* accompanying Issues and Decision Memorandum (Nov. 27, 2024), P.R. 356 ("PDM"). Commerce calculated a preliminary dumping margin of 77.85 percent for TTL. *Id.* This served as the "all others" rate and equally applied to MLT. *Id.* In its *Preliminary Determination*, Commerce stated that it would address petitioner's PMS allegation in a post-preliminary decision. PDM, at 23.

As a part of its *Preliminary Determination*, Commerce adjusted TTL's reported total cost of manufacture by [        ] percent pursuant to 19 U.S.C. § 1677b(f)(3), *i.e.*, the "Major Input Rule." *See* Commerce Memorandum, "Cost of Production and Constructed Value Calculation

4

NON-CONFIDENTIAL VERSION

Adjustments for the Preliminary Determination—Trina Solar Science & Technology (Thailand) Ltd." (Nov. 27, 2024), at 2 ("Prelim. Cost Memo"), P.R. 360, C.R. 168. Commerce analyzed TTL's wafer purchases from affiliated non-market economy producers and compared them to surrogate market values and to surrogate COP. *Id.* Commerce derived the surrogate COP amount by using average unit value import data from Trade Data Monitor ("TDM"), covering Malaysia, Turkey, Mexico, and Indonesia. *See id.*, at Attach. 1A. As a surrogate market price, Commerce used Thai import statistics under HTS code 3818.00, submitted by the Petitioner in its PMS allegation, amounting to $400.77/kg. *See id.*, at Attach. 1B. TTL's average purchase price of wafers was [                                    ]. *Id.*, at Attach. 1A (citing "TTL's Section D Supplemental Questionnaire Response, "(Nov. 12, 2024), at Ex. SD-4e.2 ("TTL Supp D Resp."), P.R. 310–314, C.R. 131–135. In every affiliated purchase comparison, Commerce selected the surrogate market price of $400.77/kg based on Thai import statistics under HTS code 3818.00, which increased TTL's reported purchase price for wafers by 352 percent. *Id.*

On March 24, 2025, six months after the allegation was filed, Commerce released its post-preliminary analysis addressing Petitioner's PMS allegation. *See* Commerce Memorandum, "Less-Than-Fair-Value Investigation of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from Thailand: Post-Preliminary Analysis of the Particular Market Situation," (Mar. 24, 2025) ("Post-Prelim PMS Memo"), P.R. 426, C.R. 272. Pursuant to19 C.F.R. § 351.416(d), Commerce found that a cost-based PMS exists for China-sourced wafers and solar glass. *Id.*, at 16. For wafer, Commerce selected Petitioner's broad, export price data based on global sources under HTS 3818.00. *Id.*, at 18; *see also* "Alliance's Wafer and Solar Glass Pricing Information," (Feb. 5, 2025) at Ex. 1, P.R. 403–406. For solar glass, Commerce similarly selected Eurostat import data submitted by Petitioner under HTS code 7007.19.80.

NON-CONFIDENTIAL VERSION

Post-Prelim PMS Memo, at 19.  Commerce compared these global benchmarks to (1) the adjusted Major Input Rule price of $400.77/kg for solar wafers and (2) the transfer price of solar glass from TTL's suppliers.  *Id.*, at 20.  In finding the actual wafer and solar glass purchase prices to be lower, Commerce concluded that a cost-based PMS does exist.  *Id.*  Commerce further concluded that China's dominance of the solar input market in Thailand, and its status as an NME, are more likely than not to have contributed to the identified distortion.  *Id.*

Consequently, Commerce made additional adjustments to TTL's reported wafer and solar glass inputs.  While Commerce had already increased TTL's total production cost by 165.36% in the *Preliminary Determination* under the Major Input Rule, Commerce further increased TTL's total cost of manufacturing ("TOTCOM") by an additional [      ] percent after comparing the difference in the Major Input Rule price, *i.e.*, 400.77kg, to the global PMS wafer benchmark price of $438.07/kg.  *Id.*, at 21.  For solar glass, Commerce made an additional adjustment by comparing the transactions disregarded price of [      ] to the global PMS glass benchmark price of [      ], which resulted in a [      ] percent upward price adjustment.  *Id.*, at 22.

On April 25, 2025, Commerce published its *Final Determination* in the Federal Register. 90 Fed. Reg. 17,395.  In its final determination, Commerce continued to apply a 165% upward adjustment to TTL's TOTCOM based on the Major Input Rule, applying the same average wafer market price of $400.77/kg based on Thai import data under HTS code 3818.00.  *See* IDM, at Cmt. 7.  Further, Commerce did not amend any aspect of its PMS analysis, and it continued to find that a cost-based PMS exists in Thailand as to wafer and glass inputs.  *Id.*, at Cmt. 8. Commerce also did not amend any aspect of its PMS adjustments to TTL's wafer and solar glass purchases, and it continued to rely on broad, non-product specific benchmarks.  *Id.*; *see also* Commerce Memorandum, "Cost of Production and Constructed Value Calculation for the Final

Determination—Trina Solar Science & Technology (Thailand) Ltd." (Apr. 18. 2025) ("Final Cost Memo"), P.R. 452, C.R. 283. As a result of Commerce's PMS and Major Input Rule adjustments, the final weighted-average dumping margin and ongoing cash deposit rate for TTL was set at 111.45 percent. As a non-examined respondent, this same rate applied equally to MLT.

## STANDARD OF REVIEW

In reviewing a challenge to Commerce's determination, the Court "shall hold unlawful any determination, finding, or conclusion found. . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951). It must be "more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established." *N.L.R.B. v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939). The Court "looks to the record as a whole, including any evidence that fairly detracts from the substantiality of the evidence," *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (internal quotation marks and citation omitted), and determines "whether the evidence and reasonable inferences from the record support {the agency's} finding." *Daewoo Elecs. Co. v. Int'l Union of Elec., Tech., Salaried & Mach. Workers, AFL-CIO*, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (internal quotation marks and citation omitted). Commerce must provide a "rational connection between the facts found and the choice made," *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) and "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30 (1983).

7

Commerce is also required by law to include in its final determination "an explanation of the basis for its determination that addresses relevant arguments{ } made by interested parties who are parties to the investigation or review." 19 U.S.C. § 1677f(i)(3)(A). *See also NMB Sing. Ltd.* v. *United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009). Further, the Court will not sustain Commerce's determination when Commerce failed to address a party's relevant argument. *See Nucor Corporation v. United States*, 461 F. Supp. 3d 1374, 1380 (Ct. Int'l Trade 2020) (*citing Stein Industries Inc. v. United States*, 365 F. Supp. 3d 1364, 1371 (Ct. Int'l Trade 2019).

<div align="center">

**ARGUMENT**

</div>

**I.    COMMERCE'S ADJUSTMENT UNDER THE MAJOR INPUT RULE BASED ON THAI IMPORT DATA UNDER HTS 3818.00 WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW**

In the underlying *Final Determination*, Commerce applied the Major Input Rule and disregarded the wafer purchase prices and cost of production ("COP") data from TTL's affiliated wafer suppliers in favor of a "market price" that was 352% higher wafer than TTL's wafer purchase price. *See* Final Cost Memo, at Attach. 1. In selecting a market price, Commerce relied on imports into Thailand under HTS code 3818.00, after excluding 99.9 percent of the imports under this HTS classification. *See* Prelim. Cost Memo, at Attach. 1B, *see also* "TTL's Ministerial Error Allegation," at 5 and Attach. 1, (Dec. 9, 2024), P.R. 379, C.R. 186. Of the total [      ] percent upward TOTCOM adjustment made by Commerce to TTL's overall reported costs, 165.36 percent is attributable to Commerce's adjustment for wafers under the Major Input Rule. *See* Final Calc. Memo, at Attach 2. As explained below, Commerce's selection of a highly aberrational market price to value TTL's wafer purchase is unsupported by substantial evidence. Commerce's refusal to consider the "best available information" provided by other

<div align="center">

8

</div>

sources on the record is further unsupported by substantial evidence and not in accordance with law.

## A. Legal and Factual Background

Under 19 U.S.C. §1677b(f)(3), and relevant regulations, Commerce may apply the "Major Input Rule" to affiliated purchases of major inputs. 19 U.S.C. §1677b(f)(3) provides that Commerce may adjust affiliated party transactions for major inputs based on information available if it has "reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the cost of production of such input." Under Commerce's regulations, when selecting a value for a major input pursuant to this statutory provision, Commerce will select the higher of (1) the purchase price to the affiliated supplier, (2) the affiliate's COP for producing the input, or (3) the "amount usually reflected in sales of the major input in the market under consideration." *See* 19 C.F.R. § 351.407(b). In selecting a market price or surrogate COP price under this framework, Commerce's selection "must still be reasonable under the substantial evidence standard." *See Best Mattress International Co. Ltd. v. United States*, 622 F.Supp.3d 1347, 1373 (Ct. Int'l Trade 2023).

In the *Preliminary Determination*, to value TTL's affiliated wafer purchases under the Major Input Rule, Commerce selected the market price of wafers under 19 C.F.R. § 351.407(b)(3), which represented the highest value among all three options:

| Supplier | Transfer Price USD/kg | Market Price – Thai Import Data USD/kg | Surrogate COP – AUV Data USD/kg[2] | Highest of TP, MP, or COP | Increase in TP |
|---|---|---|---|---|---|

---

[2] In the Preliminary Determination, Commerce erroneously claimed that TTL had not provided affiliate COP information, and Commerce therefore used a surrogate COP cost. Prelim Analysis Memo, at 2. In fact, TTL had submitted COP data for all affiliated wafer suppliers. *See* TTL Supp D Resp., at Ex. SD-4e.2. For wafers, [    ]% of TTL's purchases were based on above-cost transfer prices. *Id.* Moreover, from those above-cost purchases, the average markup between the cost of production and the price to TTL was [    ] %, establishing that TTL's purchase prices from affiliates were well-above the cost of production.

9

| | | | 400.77 | 14.39 | 400.77 | [ | ] |
|---|---|---|---|---|---|---|---|
| [ | | ] | 400.77 | 14.39 | 400.77 | [ | ] |
| [ | | ] | 400.77 | 14.39 | 400.77 | [ | ] |
| [ | | ] | 400.77 | 247.35 | 400.77 | [ | ] |

TTL Prelim Analysis Memo, at Attach. 1A. As shown, Commerce's selection of the market price value at $400.77/kg represented a [                    ]% increase from the transfer price. *Id.* Commerce sourced the market price from Thailand International Trade Statistics Report, which provided the average unit value of imports into Thailand under HTS code 3818.00, covering imports of any chemically doped discs, wafers, or similar forms. *Id.*, at Attach. 1B. Commerce excluded imports from non-market economy countries and countries with export subsidies. *Id.* In doing so, Commerce excluded the import data from the largest wafer producing markets, including China, Vietnam, India, South Korea, and Indonesia. *Id.*

In the *Final Determination*, Commerce continued to apply the Major Input Rule and relied on the market price of $400.77/kg to value TTL's wafer purchases, based on Thai import statistics under HTS code 3818.00. Final Cost Memo, at Attach 2 (citing Prelim. Cost Memo, at Attach 1B). Critically, Commerce did not respond to interested parties' arguments that Thai imports under HTS 3818.00 was a wholly inappropriate source for establishing the market price under the Major Input Rule. *See* IDM, at 22–28 (copying excerpts from TTL and Canadian Solar's case briefs, but providing no response to arguments that Commerce's selection of a Thai wafer market price under HTS 3818.00 was a wholly unsuitable benchmark for the Major Input Rule). *See also,* "TTL's Case Brief," (Mar. 17, 2025), at 29–34, P.R. 420, C.R. 268–69 ("TTL Case Brief"); "Case Brief of Canadian Solar," (Mar. 17, 2025), at 23–31, P.R. 419, C.R. 267.

### B. Commerce's Reliance on Thai Imports Under HTS 3818.00 for Valuing TTL's Wafer Input Market Price was Unreasonable

NON-CONFIDENTIAL VERSION

To value a "market price" for TTL's wafer purchases under the Major Input Rule, Commerce relied on highly aberrational Thai import data that was unrepresentative of solar wafers. First, Commerce relied on an overbroad and non-specific HTS classification of 3818.00, a classification category it has explicitly rejected as a benchmark in prior solar proceedings. Second, the underlying import data is distorted and reflects imports from non-solar wafer producing countries. Further, the remaining import data lacks sufficient volume and reliability to constitute a usable benchmark for valuing solar wafer. Finally, Commerce's refusal to consider or acknowledge other superior sources on the record was unreasonable. Taken together, the record shows that Commerce selected a market price benchmark that had not even a remote connection to the actual value of solar wafer inputs, rendering its determination unsupported by substantial evidence.

### i.   The Thai Import Data under HTS 3818.00 was Unreliable as a Benchmark for Valuing Solar Wafers

In selecting a "market price" for TTL's solar wafers, Commerce relied on Thai import data under HTS 3818.00. This HTS code encompasses a broad basket category of dissimilar products unrepresentative of solar-grade wafers. HTS 3818.00 is defined as "Chemical elements doped for use in electronics, in the form of discs, wafers or similar forms; chemical compounds doped for use in electronics." *See* Prelim. Cost Memo, at Attach 1B. As a threshold matter, this classification covers dozens of products that have no solar-grade polysilicon content. HTS 3818.00 includes resin pastes, nickel pellets, CT-50 cans, rux hardener, crystal substrates, tin concentrates, cleanroom lotions, alkaline detergents, and copper alloy chemical particles, etc. *See* TTL Supp D Resp., at Appendix 9.1 (showing Japan as a large exporter of resin paste; showing Singapore as a large exporter of tin concentrate, nickel pellets, and slototin additives). Customs rulings from the United States and the European Union further establish that

11

classification of non-solar-grade wafer products, specifically P-type/N-type antimony and bismuth ingots and lithium tantalate discs, also fall under HTS 3818.00. *See*, "TTL's Rebuttal to Petitioner's RFI on TTL's Supplemental D Response," (Dec. 9, 2024) ("TTL Dec. 9 RFI"), at Exhibits WAFER-4A, 4B, 5A, and 5B, P.R. 373–78, C.R. 178–85. Import data under HTS 3818.00 therefore captures the average unit values of a wide range of chemical products unrepresentative of solar wafers.

TTL also submitted information from Clean Energy Associates ("CEA") demonstrating that HTS code 3818.00 includes imports of both PV-grade wafers and electronics-grade ("EG") wafers. *See* "TTL's Pricing Information with Regard to Wafers and Solar Glass," (Feb. 5, 2025), at Ex. 4B, P.R. 399–401 ("TTL Feb. 5 Info"). PV-grade wafers are used for solar cells, and electronics-grade wafers are used in semiconductors wafers, applicable to a variety of electronics products. *Id.* Therein, CEA explained that "PV and EG wafers have massively different price points, given the differences in manufacturing specifications and end-use tolerance for failure and purity; the two products should not be compared or intermingled when determining a fair market value." *Id.* HTS 3818.00 therefore also reflects the average unit values of electronic-grade wafers used in semiconductors, not a value for solar wafers.

In prior cases, Commerce itself has explicitly rejected data under HTS 3818.00 as a solar wafer benchmark, determining that the HTS classification is too broad and unrepresentative of solar wafers:

> The HTS category covering silicon wafers – HTS 3818 (chemical elements doped for use in electronics, in the form of discs, wafers or similar forms; chemical compounds doped for use in electronics) – is not further itemized and covers a wide range of products that may not specifically reflect the cost of solar-grade wafers.
>
> Also, wafers for solar cells are primarily made of polysilicon. In the investigation and first five administrative reviews of this proceeding, we found that differences

12

in silicon purity levels can result in significant price differences. Therefore, in each of these segments of the proceeding, we relied on international prices in valuing either polysilicon or wafers, or both. Given the wide range of products covered by the Malaysian HTS number for wafers, it is more likely that the Malaysian imports include products with a silicon purity level that significantly differs from the silicon purity level required for wafers used to manufacture solar cells.

*See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017-2018*, 85 Fed. Reg. 7,531 (Feb 10, 2020) and Preliminary Decision Memorandum (Jan. 31, 2020), at 25–26.

The Thai HTS category covering silicon wafers – HTS 3818 (chemical elements doped for use in electronics, in the form of discs, wafers or similar forms; chemical compounds doped for use in electronics) – is not further itemized and covers a wide range of products that may not specifically reflect the cost of solar-grade wafers.

*See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2016–2017*, 83 Fed. Reg. 67,222, 67,223 (Dec. 28, 2018) and accompanying Preliminary Decision Memorandum (Dec. 20, 2018). Here, the Thai import data relied on by Commerce similarly covered a wide range of chemical products that vary widely in price points. For the same reasons Commerce found in prior solar proceedings, Commerce should have not relied on import data under HTS 3818.00 here to value wafer inputs.

Second, the Thai import data used by Commerce include several key anomalies that further reveal its unreliability as a benchmark for solar wafers under the Major Input Rule. The data included imports from countries with *no* solar wafer production, further distorting the Thai import price. TTL Dec. 9 RFI, at Ex. WAFER-2A; *see also* PMS Allegation, at Exhibit PMS-1 (page 33 of sub-Exhibit NSA-9, showing wafer manufacturing capacity outside of China).

13

**NON-CONFIDENTIAL VERSION**

Although the Thai data under HTS 3818.00 span 21 countries, only eight —Hong Kong, India, Japan, South Korea, the Philippines, Singapore, Taiwan, and Vietnam—have any solar-grade wafer production capacity. *See* PMS Allegation, at Exhibit PMS-1 (page 33 of sub-Exhibit NSA-9). Yet, among this group, Commerce excluded India, South Korea, and Vietnam from its analysis, leaving a mere 14,769 kg of product left in the dataset used by Commerce. *Id*; *see also* TTL Case Brief, at Attach. II.1 (providing an analysis of Thai import data under HTS 3818.00). Nearly 90 percent of such imports relate to imports from Hong Kong covering a single month of data —April 2023. *Id.* Accordingly, even if Commerce had filtered the Thai import data under HTS 3818.00 to solar wafer producing countries only, the data would have reflected imports from a single market within a single month. Relying on such data would have equally failed to constitute substantial evidence as a reliable benchmark for solar wafers. Thai import data of HTS 3818.00 was therefore wholly unrepresentative and an unreliable source for approximating a solar wafer value.

Finally, the Thai import data used by Commerce as a market price suffered from other issues. The United States, which has not had solar wafer production since 2016, reported an import price under HTS 3818.00 into Thailand of $8,072/kg, dramatically skewing the average Thailand import price. *See* Prelim. Cost Memo, at Attach. 1B; PMS Allegation, at Exhibit PMS-1 (at sub-Exhibit NSA-9); TTL Case Brief, at Attach. II.1. This aberration alone should have revealed to Commerce the unreliability of HTS 3818.00 imports as a benchmark. Relatedly, many of the trading countries appearing in the import data do not export large volumes, if any, of

14

solar-grade wafers. TTL submitted evidence establishing that Japan, the United States, and Singapore, are not exporters of solar-grade wafers.[3]

The record therefore makes apparent that trade data under HTS 3818.00 encompasses non-comparable products including chemicals, pastes and non-silicon content that are wholly unrepresentative of solar wafer prices. The Thai import data from HTS 3818.00 clearly included bulk industrial commodities and highly specialized, low-volume and high-value products (*e.g.*, resulting in $8,072/kg unit values), thereby creating a skewed average unit value not reflective of solar wafers By entirely ignoring these aberrations, Commerce unlawfully disregarded record evidence that significantly "detracted from the weight" of its market price selection. *Universal Camera Corp.*, 340 U.S. at 488.

### ii. Commerce's Selection of a Benchmark Market Price was Aberrational and Unsupported by Substantial Evidence

Taken together, Commerce unlawfully relied on aberrational and unrepresentative Thai import data under HTS 3818.00 to value TTL's solar wafer inputs. Commerce's benchmark selection contained several glaring distortions that Commerce failed to address or rationalize. Namely, its market price benchmark reflected a [    ]% to [    ]% markup over the transfer price of wafers. *See* Prelim. Cost Memo, at Attach. 1A. When a benchmark price yields an exponential magnitude of difference from actual production costs or verified market prices, it fails to represent a suitable market price. Commerce unreasonably ignored the distortions in and unrepresentativeness of the HTS 3818.00 Thai import data when selecting among benchmarks

---

[3] *See* Letter from Trade Pacific PLLC, "Response to PMS Allegation," at Ex. BMARK-1A (Oct. 18, 2024) ("TTL Oct. 18 Resp.") P.R. 259–66, C.R. 112–120; TTL Supp D. Resp., at Appendix 9.1 (showing Japan as a large exporter of resins, silicon gels and adhesives, and other non-silicon wafer products). The record shows that the United States exported crystal substrates containing no silicon content. TTL Dec. 9 RFI, at Ex. WAFER-1. The record also shows that Singapore exported sulfates, nickel pellets, additives, tin concentrates, molding compounds, cleanroom lotions, antifoams, alkaline detergents, and other miscellaneous non-silicon wafer products. TTL Oct. 18 Resp., at Ex. BMARK-1B.

NON-CONFIDENTIAL VERSION

under the Major Input Rule.  Its failure to do so results in a determination that is unsupported by the record.

In selecting a surrogate market price, the Court of Appeals for the Federal Circuit has made clear that Commerce should "avoid the use of distorted surrogate prices." *Nation Ford Chern. Co. v. United States*, 166 F.3d 1373, 1378 (Fed. Cir. 1999).  Moreover, Commerce itself, in the preamble to its regulations, recognizes that it does not use surrogate data that is "aberrational." *Antidumping Duties, Countervailing Duties*, 62 Fed. Reg. 27,296, 27,366 (May 19, 1997) (Final Rule).  Thus, when "confronted with a colorable claim that the data that Commerce is considering is aberrational, Commerce must examine the data and provide a reasoned explanation as to why the data it chooses is reliable and non-distortive." *Mittal Steel Galati S.A. v. United States*, 502 F. Supp. 2d 1295, 1308 (Ct. Int'l Trade 2007); *Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262, 1277–78 (Ct. Int'l Trade 2006).  This Court has previously remanded aberrational import data where Commerce's selected benchmark was three times higher than the input it was attempting to value. *An Giang Fisheries Import and Export Joint Stock Company v. United States*, 179 F.Supp.3d 1256, 1275 (Ct. Int'l Trade 2016) (remanding for Commerce to explain why it selected an aberrational, high surrogate value).

By failing to scrutinize a benchmark that produced a commercially impossible result, *i.e.*, an average 352% markup in input prices, Commerce's decision was unreasonable.  Any agency action that is unreasonable given the record as a whole cannot be supported by substantial evidence. *Fuwei Films (Shandong) Co., Ltd. v. U.S.*, 837 F.Supp.2d 1347, 1350 (Ct. Int'l Trade 2012) ("{T}he court analyzes whether the challenged agency action was reasonable given the circumstances presented by the whole record.") (internal quotations omitted).

### C. Commerce's Failure to Consider Alternative Benchmark Sources for Solar Wafer was Unreasonable

16

Throughout the underlying proceeding, TTL argued that the deficiencies and anomalies apparent in Commerce's selection of Thai import data under HTS 3818 made it unsuitable as a benchmark under the Major Input Rule. TTL Case Brief, at 19–34; *see also* "TTL's Comments for the Preliminary Determination," at 15–18 (Nov. 19, 2025), P.R. 318, C.R. 141. In the *Final Determination*, Commerce never addressed TTL or other interested party's arguments. *See* IDM, at 22–28 (copying excerpts from TTL and Canadian Solar's case briefs, but providing no response to arguments that Commerce's selection of a Thai wafer market price under HTS 3818.00 was a wholly unsuitable benchmark for the Major Input Rule). Commerce's failure to address comments and arguments by parties that its Major Input Rule benchmark selection was not the "best available information" was *prima facie* unreasonable. As detailed below, parties presented numerous other—and far superior—market price sources that detracted from the reasonableness of Commerce's Thai import data benchmark selection. *See Ad Hoc Shrimp Trade Action Committee v. United States*, 219 F.Supp.3d 1286, 1298 (Ct. Int'l Trade 2017) ("Commerce's explanation is nonresponsive. Commerce's obligation to secure the best information is meant to foster accuracy,") (citing *Shakeproof Assembly Components v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001); *see also SKF USA Inc. v. United States*, 630 F.3d 1365, 1374 (Fed. Cir. 2011) ("Commerce also has an obligation to address important factors raised by comments from petitioners and respondents"). Accordingly, because Commerce "failed to take into account whatever in the record fairly detracts from its weight," its decision to select Thai import data under HTS 3818.00 without considering other benchmark sources is unsupported by substantial evidence. *Universal Camera Corp.*, 340 U.S. at 488.

The underlying record contained several alternative sources for valuing Thai solar-grade wafer market prices contemporaneous with the POI. *See* TTL Feb. 5 Info, at Ex. 1 (providing a

17

summary of solar wafer POI sources). First, TTL submitted solar wafer costs on the record from Hanwha Q Cells, a mandatory respondent in the companion investigation on solar cells from Malaysia. *See* TTL Feb. 5 Info, at 4 and Ex. 7. Hanwha's inventory schedule for wafers used to produce solar cells in Malaysia showed that its cost ranged between $0.45 to $0.49/kg. *Id.* Second, TTL submitted solar wafer pricing, exclusive of China, from TrendForce, a professional research institute based in Taiwan. *See* TTL Feb. 5 Info, at Ex. 2A. This data showed POI wafer prices of $99.24/kg. *Id.* As a third alternative, TTL also submitted POI wafer prices from Clean Energy Associates ("CEA"), with an average price of $78.95/kg. *See* TTL Feb. 5 Info, at Exs. 3A–3C. This source also excluded data from China and represented TOPCon (n-Type) 182mm wafers, specific to the type of wafers purchased by TTL. *Id.* Finally, TTL also submitted Descartes Datamyne data and Volza data reflecting solar wafer-specific data from known solar wafer producing markets (*i.e.*, Vietnam, Malaysia, Norway, and Taiwan). *See* TTL Feb. 5 Info, at Exs. 4, 5. These data sources showed an average price of $66.13/kg, and $77.82/kg, respectively. *Id.*

Each one of these sources represented far superior data compared to Commerce's reliance on the broad, nonspecific, and aberrational Thai import data under HTS 3818.00. That is, the alternative wafer benchmarks are contemporaneous with the POI, specific to solar wafers, include prices that were exclusive of China, and are from four reputable and publicly available sources. Each one of these proposed sources constitutes "best information available" on the record to determine a surrogate market price under 19 U.S.C. §1677b(f)(3).

While Commerce discussed some of these sources for the purposes of determining a PMS benchmark, as addressed in Section II of this brief below, Commerce never weighed or considered any alternative sources for the purposes of selecting a market price benchmark under

18

the Major Input Rule. *See* IDM, at 47–52 (discussing PMS benchmarks), compared to IDM, at 28–31 (failing to address any alternative sources for benchmarks under the Major Input Rule). The benchmarks serve separate and distinct purposes. Further, the benchmarks were used and applied separately in the antidumping calculation. *See* Final Cost Memo, at Attach. 2. Commerce was required to consider and weigh all alternative sources for the purpose of selecting a market price benchmark under the Major Input Rule, and its failure to do so was unlawful.

In summary, Commerce's adjustment under the Major Input Rule was both unreasonable and aberrational, resulting in a 352% increase from TTL's wafer cost. It is established principle that Commerce's determinations be "bound by reasonableness." *See Vicentin S.A.I.C. v. United States*, 404 F.Supp.3d 1323, 1342 (Ct. Int'l Trade 2019). By inexplicitly selecting the least representative source on the record, and disregarding far superior sources in the process, Commerce's determination was unreasonable and lacked any basis in substantial evidence. For these reasons, Commerce's Major Input Rule adjustment cannot be sustained.

## II.   COMMERCE'S FINDING OF A PMS IN THAILAND FOR SOLAR WAFERS IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

Commerce's determination that a cost-based PMS exists in Thailand for solar wafers, thereby permitting Commerce to make an additional adjustment to TTL's wafer costs, is unsupported by substantial evidence. First, Commerce's finding of a PMS as to solar wafers rests on the premise that wafer costs are distorted in Thailand due to artificially low-priced Chinese polysilicon. Post-Prelim PMS Memo, at 16; PMS Allegation, at 11. However, as explained throughout the underlying proceeding, TTL did not source any wafers that incorporated Chinese polysilicon. That is, TTL's wafers were made entirely with [          ] polysilicon, a premium product with much higher costs. Commerce disregarded TTL's non-China supply chain, finding that the PMS analysis must consider "Thailand, as a whole, and not

19

NON-CONFIDENTIAL VERSION

merely. . . TTL's own experience." IDM, at 39. Yet, Commerce erred by failing to consider that TTL represents [      ] of all subject exports from Thailand, and unlawfully disregarded TTL's actuals sourcing patterns in reaching a PMS determination. Second, Commerce's determination that a distortion is caused by solar wafer inputs relies on inherently circular reasoning. In selecting a benchmark unrepresentative of solar wafer prices, Commerce predetermined a finding that a distortion exists. Commerce cannot manufacture a market distortion based on a product (*i.e.*, Chinese wafers using Chinese polysilicon) never consumed by TTL in the production of subject merchandise. For both of these reasons, Commerce's PMS finding as to solar wafer is unsupported by substantial evidence and is not in accordance with law.

## A. Legal Background

Section 504 of the Trade Preferences Extension Act of 2015 ("TPEA") revised 19 U.S.C. § 1677b(e) to permit Commerce to "use another calculation methodology" to calculate "the cost of materials and fabrication . . . employed in producing the merchandise," but only "if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade." 19 U.S.C. § 1677b(e). This provision therefore is triggered only if both a "particular market situation" exists and the respondent's "costs of materials and fabrication or other processing" do not "accurately reflect the cost of production in the ordinary course of trade." Commerce's practice has established that "a finding that a PMS exists is reserved for limited circumstances and must be based on substantial evidence that the alleged distortion is so significant that it creates an inability to compare foreign and domestic prices." *See Circular Welded Carbon Steel Pipes and Tubes from Thailand: Final Results of Antidumping Duty*

20

*Administrative Review; 2016-2017*, 83 Fed. Reg. 51,927, 27,357 (Oct. 15, 2018), and accompanying Issues and Decision Memorandum, at cmt. 2.

In March 2024, Commerce amended its regulations applicable to PMS allegations, procedures, and findings. *See Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 89 Fed. Reg. 20,831 (Mar. 25, 2024) (*"Final Rule"*); *see also* 19 C.F.R. § 351.416. Therein, Commerce established a three part test to guide its PMS analyses, establishing that there must be: (1) a finding of a circumstance or set of circumstances that impacts costs or prices; (2) a finding that costs were distorted; and (3) a finding that it is more likely than not that the circumstances or set of circumstances at issue contributed to the distortion of the costs of production of the subject merchandise. 19 C.F.R. § 351.416(d).

In prior decisions, this Court has also confirmed that "the mere existence of government intervention in a market is not enough for Commerce to disregard a respondent's home market sales" (in the case of a cost-based PMS, a respondent's actual costs). *See Wilmar Trading Pte Ltd. v. United States*, 675 F.Supp.3d 1215, 1229 (Ct. Int'l Trade 2023). Rather, Commerce must demonstrate, "through reasonable explanation and evidentiary support just how that intervention prevented a proper comparison" between costs which occurred outside the ordinary course of trade. *Id.*, at 1229–30.

## B. Factual Background

In Petitioner's September 19, 2024, PMS allegation, it alleged that TTL's cost of production ("COP") is distorted due to China's dominance in the Thai market for supplying solar wafer and glass, and China's status as a non-market economy. PMS Allegation, at 10, 11. The Petitioner alleged that "dramatic differences in the prices" exist between Chinese and non-

21

NON-CONFIDENTIAL VERSION

Chinese inputs. *Id.*, at 11. Further, the Petitioner asserted that "the non-China polysilicon price is roughly three times that of Chinese-produced polysilicon." *Id.*, at 13. The Petitioner requested that Commerce instead use surrogate values to calculate normal value for TTL's inputs. *Id.*, at 15. In doing so, the Petitioner proposed various sources of import statistics for Commerce to use as surrogate values for valuing allegedly distortive solar wafer and glass.

In Commerce's post-preliminary PMS decision, Commerce agreed that China's dominance in the Thai market of solar wafer and glass inputs was a "circumstance. . . that may have particularly impacted the costs of wafer and solar glass inputs into the production of solar merchandise." Post-Prelim PMS Memo, at 16 (citing PMS Allegation, at 6). From there, Commerce analyzed whether the costs of such inputs are distorted, and whether it is more likely than not that the circumstance or set of circumstances contributed to such distortion. *Id.* To determine whether there was a distortion for wafers, Commerce relied on Petitioner's global import pricing data under HTS 3818.00 as a benchmark for comparison, averaging to $438.07kg. Post-Prelim PMS Memo, at 16, 18–19. Commerce compared this benchmark price to the adjusted Major Input Rule price of $400.77/kg, a purchase price which was *also* based on a benchmark from Thai import data under HTS 3818.00. *See* Prelim. Cost Memo, at Attach. 1A. In finding the PMS benchmark to be higher than the solar wafer market purchase price under the Major Input Rule, Commerce concluded that "there is a distortion in the price of wafer in Thailand and that a cost-based PMS does exist." Post-Prelim PMS Memo, at 20. Finally, in analyzing whether the market situation is particular, Commerce concluded that "Chinese global dominance as a supplier of solar inputs and volume of imports into Thailand specifically affected Thai markets for wafers. . .in particular, not all products." *Id.*, at 21.

22

In determining whether a PMS adjustment was appropriate, Commerce determined that an additional adjustment—in addition to the [      ] percent adjustment made for the Major Input Rule—was necessary because there remained a difference of $37.30/kg between the Major Input Rule benchmark of $400.77/kg and the PMS benchmark of $438.07/kg. *Id.*, at 21. Accordingly, Commerce determined that because the "PMS cost distortion was not sufficiently addressed by application of the major input rule, we have determined to further adjust the calculation." *Id.* Commerce therefore applied an additional [      ] percent adjustment to TTL's wafer purchases, amounting to a total adjustment of [      ] percent for TTL's wafer purchases. Final Cost Memo, at Attach. 2. Commerce did not amend any aspect of its post-preliminary PMS decision in the final determination. *See id.*

Throughout the underlying investigation, in response to the Petitioner's cost-based PMS allegation against solar wafers, TTL submitted various sources of information on the record to (1) establish that none of its polysilicon was sourced from China, (2) to demonstrate that its wafer purchase prices were not distortive and above market averages, and (3) to provide several non-China based benchmarks for the identical product used by TTL, *i.e.*, large format wafers. As discussed below, Commerce's affirmative finding of a PMS in Thailand cannot be supported by substantial evidence when the record shows that TTL sourced only non-Chinese polysilicon wafers and where Commerce's finding of a distortion stems from an unrepresentative benchmark.

## C. Commerce's Finding of a PMS in Thailand is Unsupported by the Record Because TTL did not use Chinese Polysilicon

Commerce's affirmative PMS finding as to solar wafer in Thailand centers on alleged distortions caused by Chinese wafers produced with Chinese polysilicon. The dominance of *Chinese* polysilicon was the basis to Petitioner's PMS allegation of wafer market distortion in

23

Thailand.[4] *See* PMS Allegation, at 5, 6, 8, and 12. The Petitioner relied on the "dramatic differences in prices for Chinese and non-Chinese polysilicon." PMS Allegation, at 11. Yet, the record establishes that none of TTL's polysilicon is sourced from China, thereby rendering petitioner's China-centric allegations inapplicable to TTL. *See* TTL Oct. 18 Resp., at 8; *see also* TTL Dec. 9 RFI, at Exhibit POLY-3 (showing all its wafers used polysilicon sourced from

[            ]). Critically, because TTL sourced all its polysilicon from non-China sources, which sell at substantially higher prices, TTL's wafer purchase prices were significantly higher than wafers made with Chinese polysilicon. *See* TTL Oct. 18 Resp., at 10, Ex. WAFER-3B (showing that spot prices for solar wafers during the POI were [     ] USD/kg, whereas TTL's purchase prices of wafers were [                        ] USD/kg). Furthermore, over [   ] percent of TTL's wafers were sourced from its affiliated wafer manufacturer in Vietnam, which also utilized 100 percent non-Chinese, [            ] polysilicon. *See e.g.,* TTL Oct. 18 Resp, at 7, TTL Dec. 9 RFI, at 8–9, Ex. POLY-3 (identifying [                    ] as the polysilicon producer). In other words, because TTL is sourcing wafers made with [      ] polysilicon, its wafer costs are actually higher than market prices and fail to comport with Petitioner's allegation that "low-priced CSPV products from China" are entering the Thai market. *See* PMS Allegation, at 12.

In the Final Determination, Commerce disagreed that TTL's sourcing patterns and higher wafer purchase prices should be considered in the PMS analysis:

> TTL argues that Commerce's PMS analysis is flawed because it fails to account for Thailand's domestic production of "solar inputs" and TTL's imports of such

---

[4] Specifically, the Petitioner alleged that between 2010 and 2023, the Chinese share of polysilicon production and capacity tripled. PMS Allegation, at 5. Petitioner alleged that the Chinese government's involvement in the *polysilicon* industry creates a market distortion. *Id.,* at 6. Petitioner also alleged that price "differences exist when comparing Chinese and non-China produced *polysilicon,* ranging from double to triple the price of Chinese polysilicon compared to non-China produced *polysilicon." Id.,* at 5, 6, 8, and 12.

"solar inputs" from non-China sources. However, TTL makes no arguments in its case briefs regarding the domestic production of wafers in Thailand. Rather, TTL cites only to its own experience, namely TTL states that it imports significant volumes of wafers from a non-China source. We disagree with TTL's arguments. Our PMS analysis focuses on market conditions for wafers and solar glass in Thailand, as a whole, and not merely on TTL's own experience, as the prices that TTL paid for wafers and solar glass in Thailand reflect the larger market conditions in Thailand for those inputs.

IDM, at 39.

Commerce's contention that TTL's specific wafer sourcing experience should not be considered in the PMS analysis is illogical and is contradicted by the record. TTL was selected as the sole mandatory respondent in the investigation over the objection of the Petitioner that Federal Circuit precedent requires that Commerce select at least two respondents. Respondent Selection Memo, at 3. Commerce reasoned that selection of TTL as the sole mandatory respondent was "appropriate considering that the exporter/producer, Trina Solar Thailand accounts for the overwhelming majority of imports .... and that by examining this mandatory respondent, Commerce captures the largest volume of the subject merchandise from the exporting country that can be reasonably examined." Respondent Selection Memo, at 6. Indeed, TTL represented [     ] percent of the exports from the seven companies responding to Commerce. *Id.*, at Attachment.

The statutory framework permitting the determination of the antidumping rate for unexamined exporters assumes that the experience of the largest exporters "as representative of all exporters." *See Bosun Tools Co., Ltd. v. United States*, 2022 WL 94172 at 4, (Fed. Cir. Jan 2022), ("{t}he very fact that the statute contemplates using data from the largest volume exporters suggests an assumption that those data can be viewed as representative of all exporters.") (citing *Albemarle Corp. v. United States*, 821 F.3d 1345, 1353 (Fed. Cir. 2016)). Commerce's dismissal of TTL's experience with regard to wafer purchases as irrelevant or

25

unrepresentative of the conditions in Thailand generally conflicts with its own rationale for selecting only TTL as the mandatory respondent and with the assumption in the statute that the experience of the largest exporters is representative. TTL's experience is therefore representative of the Thai market as a whole, and Commerce unreasonably failed to consider the sourcing of TTL's wafers when determining whether "a circumstance or set of circumstances existed" that may have impacted TTL's production of subject merchandise.

In short, Commerce lacked any basis to conclude that the alleged distortion "does not accurately reflect the COP in the ordinary course of trade" because TTL only sourced wafers using [          ] polysilicon and it represented an "overwhelming majority" of subject merchandise producers in Thailand. 19 U.S.C. § 1677b(e). Commerce must make an evidence-based finding for its proposition that the cost of solar wafer inputs fails to reflect costs "in the ordinary course of trade." *See Wilmar Trading Pte Ltd.*, 675 F.Supp.3d at 1229–30. In doing so, Commerce is required to "meaningfully address contradictory record evidence," such that none of TTL's wafer sourcing is affected by the Petitioner's alleged PMS. *Id.*, at 1229. Accordingly, Commerce's finding of a cost-based PMS for solar wafers in Thailand was unlawful because it lacked evidentiary support and failed to address detracting evidence on the record.

### D. Commerce's PMS Finding Lacks a Basis for Finding Any Market Situation "Particular"

In addition, Commerce's PMS finding is unlawful because it is not *particular* to Thailand, much less TTL or the Thai solar industry. The agency's entire PMS analysis rests on assumptions regarding "Chinese global dominance as a supplier" of CSPV input materials. IDM, at 39. But, China's alleged "global dominance" is not particular to Thailand. Commerce's regulations explain: "A market situation is *particular* if it impacts prices or costs *for only certain parties or products in the subject country*." 19 C.F.R. § 351.416(e)(1) (emphases added). The

26

regulations provide: "The same or similar market situations can exist in multiple countries or markets and still be considered particular . . . {if} a market situation exists which distorts sales prices or cost of production for *certain parties or products specifically in the subject country*." *Id* (emphasis added). As such, while it may find that a PMS exists in multiple countries, Commerce may not claim a PMS without tying these market conditions, with particularity, to specific parties or products in the country under investigation.

This court and the U.S. Court of Appeals for the Federal Circuit have emphasized that this particularity requirement imposes a strict limit on Commerce's ability to find a PMS. In an administrative review of the AD order on *Certain Oil Country Tubular Goods from Korea*, Commerce initially found that a PMS existed because of, *inter alia*, imports of low-priced hot-rolled coil ("HRC") inputs from China. *See NEXTEEL Co. v. United States*, 28 F.4th 1226, 1234 (Fed. Cir. 2022). Both this Court and the Federal Circuit disagreed, however, finding that the alleged existence of imports of low-priced Chinese steel did not constitute a PMS. The Federal Circuit reasoned: "Although low-priced Chinese steel could contribute to a particular market situation, the record does not show sufficient particularity for this circumstance to create a particular market situation on its own. Commerce acknowledged that significant quantities of cheaper Chinese HRC *flow to many countries and 'affect{} the whole world.*'" *Id.* at 1237 (emphasis added); *see also NEXTEEL Co. v. United States*, 633 F. Supp. 3d 1190, 1197 (Ct. Int'l Trade 2023) ("The Court sustains Commerce's determination that record evidence of low-priced Chinese steel did not support a {PMS} determination in Korea."); *see also, e.g., Husteel Co. v. United States*, 426 F. Supp. 3d 1376, 1391 (Ct. Int'l Trade 2020) (holding Commerce PMS finding to be unsupported by substantial evidence and noting, "Defendant concedes that Chinese overcapacity is 'not a phenomenon specific to the Korean market.'"), *aff'd sub nom. Hyundai*

*Steel Co. v. United States*, 19 F.4th 1346 (Fed. Cir. 2021). The Federal Circuit's decision in *NEXTEEL* makes clear that Commerce is prohibited from finding a PMS by just referencing subject-country imports of an input that China exports globally.

Here, Commerce may not lawfully claim that it has satisfied the particularity requirement simply by adding the words "in particular" to a conclusion regarding an allegedly global phenomenon. The agency concluded that "Chinese global dominance as a supplier of these particular products (wafers and solar glass) and the volume of imports of these particular products into Thailand specifically effected Thai markets for wafers and solar glass, in particular." IDM, at 39. Commerce's logic is that (a) China dominates the global supply, (b) Thailand is a country that participates in this global market, and (c) Chinese dominance is thus particular to Thailand, TTL, and the Thai solar industry. This reasoning could apply to many countries, companies, and industries across the globe, and is therefore clearly not particular. Indeed, Commerce's PMS would not solely impact the solar industry, but rather *all industries globally* that require refined silicon and glass products as upstream inputs. By definition, a global phenomenon is not particular to the Thai market; nor does it make Thai input values out of step with market prices. The PMS finding is thus not particular and should be remanded on this basis alone.

## E. Commerce's Benchmark Selection Used to Conclude that a Cost-Based PMS Distortion Exists in Thailand is Unsupported by Substantial Evidence

In finding that a PMS exists in Thailand such that the cost of solar wafers does not "accurately reflect the COP in the ordinary course of trade," Commerce relied on a global benchmark unrepresentative of solar wafers. That is, the entire basis of Commerce's affirmative PMS finding rests on outcome-driven circular reasoning: Commerce selected a non-specific global benchmark under HTS 3818.00—inclusive of resins, semiconductor wafers, and other

28

chemically doped products entirely dissimilar to solar-grade wafers— to conclude that solar wafer prices in Thailand must be distortive. Post-Prelim PMS Memo, at 20. In doing so, Commerce manufactured the very distortion it purported to discover. Commerce's analysis guaranteed a finding of distortion by selecting a meaningless benchmark of $438.07/kg, a [      ] increase over TTL's average purchase prices. *See* Final Cost Memo, at Attach 2, and Prelim. Cost Memo, at Attach. 2. The record disproved the accuracy and representativeness of the global benchmark that Commerce chose. Its reliance on that benchmark to find a market distortion renders its decision lacking any basis in substantial evidence. Because the record contained reliable, product-specific, and contemporaneous data that accurately reflected the commercial reality of solar wafers, Commerce's rejection of superior sources in favor of an unreliable benchmark was unsupported by substantial evidence.

To demonstrate that its wafer purchase prices were not distortive, TTL submitted Bloomberg New Energy Finance (BNEF) data, showing that spot prices for monocrystalline silicon wafers during the POI were [      ]/kg, whereas TTL's purchase prices of wafers were [                              ]/kg. *See* TTL Oct. 18 Resp., at 10, Ex. WAFER-3B.[5] Thus, TTL established that purchase prices of wafers were already more than [

] the global benchmark due to TTL's reliance on [

]. *Id.*

Commerce rejected the BNEF pricing data, and instead selected a benchmark source for the purposes of determining whether a cost-based PMS distortion even existed. Post-Prelim

---

[5] Canadian Solar separately provided data corroborating TTL wafer pricing data for the record of the investigation. *See Canadian Solar's Response to Commerce's Request for Wafer Pricing Information* (Feb. 5, 2025), P.R. 402, C.R. 242–244, (providing data from, among other sources, BloombergNEF, Wood Mackenzie, CEA, S&P Global Commodity Insights, and actual documented transactions).

PMS Memo, at 16. Commerce selected the Petitioner's proposed international wafer price of $438.07/kg for the POI based on all trade under HTS 3818.00, exclusive of China and Thailand. *Id.*, at 16. The administrative record demonstrates that Commerce's benchmark selection—global import data under HTS 3818.00—was the least representative source on the record. Of the thirteen sources of data placed on the record, seven were specific to solar wafers and four



were generally reflective of solar wafers. Ironically, for both the PMS benchmark and the Major Input Rule benchmark, in attempting to capture an accurate surrogate value for solar wafers, Commerce relied on the two sources that are the most unrepresentative of and least specific to solar wafers. As shown below, Commerce disregarded the most accurate data available and instead relied on unspecific sources with per unit prices that were five to ten times greater than prices specific to solar wafers:

When comparing each source, Commerce's chosen dataset under HTS 3818 was the least reliable selection for assessing the "whether a market situation existed. . . such that the cost of

materials and fabrication or other processing did not accurately reflect the cost of production of subject merchandise in the ordinary course of trade." 19 C.F.R § 351.416(d)(3). The alleged differences in import and export prices do not reveal any distortions from alleged Chinese solar wafer dominance, but instead reflect differences in the composition of products contained within the data reported under HTS 3818.00. Thus, in determining that solar wafer prices in Thailand are not competitively set, Commerce relied on a global benchmark price that was entirely unspecific to solar wafers and drastically out of line with eleven other sources on the records that were specific to solar wafer.

As indicated in the chart above, the record contained far more reliable benchmarks for solar wafer based on *non-China* prices contemporaneous with the POI. In total, the record contained eleven alternative sources for Commerce to determine a reliable benchmark.[6]

*i.  Hanwha Q Cells Wafer Information*: TTL placed solar wafer costs on the record based on public information from Hanwha Q Cells ("Hanwha"), a mandatory respondent in the companion investigation on solar cells from Malaysia. *See* TTL Feb. 5 Info, at 4 and Ex. 7. Hanwha's inventory schedule for wafers use to produce solar cells in Malaysia showed that its cost ranged between $45 to $49/kg. *Id.*, at Ex. 7 and Ex. 1. Because Hanwha purchased wafers from *unaffiliated* Chinese suppliers, it is reasonable to conclude that its wafer cost is not distorted, and higher than the cost of production of the Chinese wafer producers that supplied Hanwha.

In response, Commerce rejected the Hanwha data, finding that :

While the Hanwha pricing data are POI-specific and reflect sales to Malaysia, the data contain China produced wafer prices. Further, as they only reflect wafer

---

[6] See Letter from Trade Pacific PLLC, "TTL's PMS Case Brief," at 8-20, (Mar. 31, 2025) P.R. 437, C.R. 280. TTL summarized the eleven sources submitted by respondents that were all either specific to solar wafer or from countries that produce solar wafer. Four of the sources with wafer-specific values were exclusive of any China produced wafer (see table pages 10–11).

31

sales in the Malaysian market, the data do not reflect a broad average international price. Accordingly, we find the Hanwha prices not to be the best source of wafer prices for our PMS analysis.

Post-Prelim PMS Memo, at 17.  Likewise, in the final determination, Commerce rejected the Hanwha data, finding that the data contained "China produced wafer prices. . . {t}hus, they do not reflect prices paid for the same input under market-based circumstances." IDM, at 49.

As an initial matter, Commerce's regulations do not impose any requirement that only a "broad average international price" be used.  19 C.F.R. § 351.416(d)(3)(i) simply instructs Commerce to compare TTL's wafer purchase prices to prices for the "same input" in the "home country or elsewhere."  Neither the regulations nor the statute impose a requirement that a "broad average international price" be used for the purposes of evaluating a PMS distortion.

Second, the irony of Commerce's refusal to consider Hanwha as a source for valuing solar wafers is that in the companion investigation on solar cells from Malaysia, Hanwha's actual China-sourced wafer costs were used without any adjustment by Commerce.[7]  Thus, if TTL's affiliated wafer supplier had exported wafers to Hanwha, Commerce would have relied on those costs and prices without any adjustment.  Commerce cannot reasonably consider Hanwha's wafer costs, inclusive of Chinese-wafers, as reliable for determining the cost of production for Hanwha, but at the same time, also find that they are unreliable for use as a comparison of "prices paid for the same input under market-based circumstances" under 19 C.F.R. § 351.416(d)(i).  Commerce has already determined that those values are market-based and reliable for Hanwha's costs of production, and Commerce cannot reach an opposite conclusion here when used to compare to TTL's wafer purchase prices.  It is "well-established that 'an agency

---

[7] See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Malaysia: Affirmative Preliminary Determination of Sales at Less Than Fair Value, 89 Fed. Reg. 96,207 (Dec. 4, 2024), and accompanying Preliminary Decision Memorandum, at 22 (relying on "Hanwha Q Cells' quarterly COP data as submitted").

action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently.'" *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (internal citation omitted). Accordingly, Commerce's refusal to consider Hanwha's data as a suitable benchmark was unreasonable and unlawfully arbitrary.

*ii.   TrendForce Data*: TTL submitted solar wafer pricing from TrendForce, a professional research institute based in Taiwan. *See* TTL Feb. 5 Info, at Ex. 2. This data showed POI wafer prices of $99.24/kg. *Id.* The TrendForce data included monthly historical solar wafer spot prices for overseas non-China markets, excluding all wafer sources from China. *Id.* This data represented 210mm mono-n wafers, *i.e.*, large-format wafers, which are specific to the type of wafer purchased by TTL. TrendForce is a respected market intelligence provider whose research methodology involves first-hand data gathering from major manufacturers and leading suppliers. As noted on its website, TrendForce "has a team studying prices in the global PV chain" and its EnergyTrend research area "provides comprehensive research on the green energy industry chain," which includes specialty in solar PV.[8] *Id.*, at Ex. 2-B. Thus, this data is specific, contemporaneous, and publicly available from a reliable source.

In response, Commerce rejected the TrendForce data, asserting that it was "missing price data for almost half of the months of the POI and Commerce was unable to determine based on the record whether the TrendForce prices exclude Chinese production or reflect prices of sales to China." IDM, at 49.

Commerce's explanation for rejecting the TrendForce data is factually incorrect. In fact, the TrendForce data explicitly reflected prices that *excluded* Chinese production and *excluded* prices of sales to China. TTL Feb. 5 Info, at Ex. 2A. Within the TrendForce data, the second set

---

[8] *See* TTL's Feb 5 Indo, at Ex. 2B.

of tables expressed "Wafer prices *from overseas origins.*"[9]  *Id.*  These are not wafers produced in China, but from overseas origins. [10]  *Id.*  The reference to "Out of China" in Trendforce's report reflects the market to which the wafers were sold.  Thus, the Trendforce data expresses non-China produced wafers sold in non-China markets.  Commerce unreasonably perceived ambiguity by ignoring the actual descriptions in the TrendForce report.  Moreover, the "overseas origins" TrendForce data covered the entire POI for one type of wafer and more than half the POI for a second type of wafer.

   ***iii. CEA Report***: The record also contained POI wafer prices from CEA, with an average price of $78.95/kg.  TTL Feb. 5 Info, at Ex. 3A–3C.  This source also excluded data from China and represented wafers specific to the type of wafers purchased by TTL.  *Id.*

   In response, Commerce rejected the CEA data, asserting that "{W}hile CEA pricing data do not include China-produced wafers, sales prices are based on all markets in Southeast Asia, which presumably could include China, and the data do not specify whether China prices were included."  IDM, at 50.

   Once again, Commerce's description of the record evidence is factually incorrect.  The submitted CEA wafer prices for Southeast Asia explicitly excluded data from China.  Under CEA's "Abbreviations and key terms," Southeast Asia is defined as cell manufacturing countries including: Vietnam, Malaysia, Thailand, Cambodia, Indonesia, Philippines, Laos, and Singapore.  *See* TTL Feb. 5 Info, at Ex. 3A (slide 97).  Moreover, CEA's data clearly delineates the "China" market from the "Southeast Asia" market and shows distinct solar wafer prices.  *Id.*  Accordingly, the data from CEA is contemporaneous, product-specific, and excludes Chinese-

---

[9] *Id.*, at Ex. 2A.  The other table in Exhibit 2A represented "The price at which Chinese wafer companies export to overseas."

[10] *See* TTL's Feb. 5 Info, at 2–3, Ex. 2A.

34

produced wafers in non-China markets. Further, Commerce cannot reasonably reject data sources based on mere speculation, finding that the CEA data "*presumably* could include China." IDM, at 50, *see also Taian Ziyang Food Co., Ltd. v. U.S.*, 783 F.Supp.2d 1292, 1322 (Ct. Int'l Trade 2011) (rejecting Commerce's speculative reasoning). Commerce's rejection of the CEA benchmark was therefore unreasonable and completely detracted by actual record evidence.

TTL also submitted Descartes Datamyne data and Volza data reflecting solar wafer-specific data from known solar wafer producing markets (*i.e.*, Vietnam, Malaysia, Norway, and Taiwan). *See* TTL Feb. 5 Info, at Exs. 4, 5. These data sources showed an average price of $66.13/kg and $77.82/kg, respectively. *Id.* Both of these sources were specific, contemporaneous, and publicly available from a reliable source. Commerce's final decision memo did not explain why these sources were not considered as benchmarks for either the Major Input Rule or for assessing the alleged PMS. The Court cannot sustain Commerce's determination when Commerce failed to address a party's relevant argument. *See Nucor Corporation v. United States*, 461 F. Supp. 3d 1374, 1380 (Ct. Int'l Trade 2020).

Commerce either ignored entirely or dismissed without evidentiary support all the benchmarks proposed by TTL. In doing so, it also ignored the serious flaws in the overinclusive HTS-based benchmark proposed by the Petitioner. Commerce's chosen global benchmark relied upon for finding a PMS distortion is itself distortive and is significantly out of line with every other benchmark on the record that is specific to solar wafers. For the foregoing reasons, Commerce's finding of a PMS for solar wafers in Thailand is unsupported by substantial evidence.

## III.    COMMERCE'S FINDING OF A PMS IN THAILAND FOR SOLAR GLASS IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

35

NON-CONFIDENTIAL VERSION

In addition to its cost-based PMS finding for solar wafers in Thailand, Commerce similarly found that a cost-based PMS exists in Thailand for solar glass. Post-Prelim PMS Memo, at 19. In doing so, Commerce similarly failed to consider that a majority of TTL's solar glass inputs come from non-Thai and non-China sources. Instead, in finding there to be a distortion, Commerce relied on broad trade data under HTS 7007.19.80, unspecific to solar glass, with per unit prices that were four to five times greater than prices specific to solar glass. Similar to its finding under the PMS for solar wafer, Commerce relied on inherently circular reasoning—it found a distortion where none existed based on its selection of a distorted benchmark. Finally, Commerce failed to consider far more reliable sources on the record for valuing solar glass. For the reasons explained below, Commerce's cost-based PMS finding for solar glass in Thailand is unsupported by substantial evidence and not in accordance with law.

### A. Factual Background

In Commerce's post-preliminary PMS decision, Commerce found that a PMS existed in Thailand for solar glass due to China's "dominance in the Thai market," thereby creating a "circumstance" that may have impacted solar glass inputs in the production of solar modules. Post-Prelim PMS Memo, at 16. From there, Commerce analyzed whether the costs of such inputs are distorted, and whether it is more likely than not that the circumstance or set of circumstances contributed to such distortion. *Id.* To determine whether there was a distortion for glass, Commerce relied on Petitioner's EU Eurostat import data under HTS 7007.19.80 as a benchmark for comparison, averaging to $2.45/kg. Post-Prelim PMS Memo, at 19–20. Commerce compared this benchmark price to TTL's transactions disregarded purchase price of $[    ]/kg. *Id.*, at 22. Just as it found with the PMS for solar wafers, Commerce concluded that there is a distortion for solar glass and that a cost-based PMS therefore exists. Post-Prelim PMS

NON-CONFIDENTIAL VERSION

Memo, at 20. As with solar wafers, Commerce also found that the circumstance was particular to solar glass, and not all products. *Id.*, at 21.

In determining whether a PMS adjustment was appropriate, Commerce determined that an additional adjustment was necessary because there remained a difference of $[     ]/kg between TTL's transactions disregarded purchase price of $[     ]/kg and the PMS glass benchmark of $2.45/kg. *Id.*, at 22. Accordingly, Commerce applied a [     ] percent markup to TTL's solar glass input, which increased its total cost of manufacturing by [     ] percent. Final Cost Memo, at Attach. 2. Commerce did not amend any aspect of its post-preliminary PMS decision in the final determination. *See id.*

During the investigation, TTL submitted information on the record (1) to demonstrate that a majority of its solar glass came from non-China and non-Thai sources and (2) to provide contemporaneous, product-specific benchmarks. First, TTL reported that [   ] percent of its solar glass came from non-China and non-Thai sources. *See* TTL Supp D Resp., at Ex. SD-4e. That is, the vast majority of TTL's solar glass is from non-Chinese sources. Second, TTL submitted several product-specific and contemporaneous benchmarks, exclusive of China pricing, for the purposes of valuing whether a distortion exists in the Thai market for solar glass. First, TTL submitted import statistics from Trade Data Monitor ("TDM") covering imports specific to solar glass from Turkey, identified as economically comparable to China by Commerce. TTL Supp D Resp., at Appx 5. In addition, TTL submitted Import Genius statistics from Turkey covering imports at the twelve-digit level under HTS 7007.19.200011 and 7007.19.800015, which are specific to 2-3.2mm solar glass. TTL Feb. 5 Info, at Ex. 10A. Finally, TTL submitted global pricing data specific to solar glass and exclusive of China pricing from PV Insights, a premier

international solar research firm that issues solar glass pricing reports specifically for the solar industry. *Id.*, at 12.

As described below, Commerce's cost-based PMS finding for solar glass in Thailand is unsupported by substantial evidence when the record shows that TTL sourced a majority of its solar glass from non-China sources and where Commerce's finding of a PMS distortion is based on an unrepresentative benchmark.

### B. Commerce's Finding of a PMS Distortion for Solar Glass in Thailand is Unsupported by the Record

Commerce's determination that a cost-based PMS existed in Thailand as to solar glass inexplicitly failed to consider TTL's specific sourcing patterns. Specifically, TTL demonstrated that [    ] percent of its solar glass inputs came from non-China and non-Thai sources. *See* TTL Supp D Resp., at Ex. SD-4e. That is, TTL sourced the majority of its solar glass from

[                                        ]. *Id.* Commerce cannot reasonably reach a finding that a market-based distortion exists, and then apply that finding to a respondent that was unaffected by the alleged distortion.

In the *Final Determination*, Commerce explicitly declined to consider TTL's sourcing patterns within its PMS analysis, finding that "{o}ur PMS analysis focuses on market conditions for wafers and solar glass in Thailand, as a whole, and not merely on TTL's own experience, as the prices that TTL paid for wafers and solar glass in Thailand reflect the larger market conditions in Thailand for those inputs." IDM, at 39.

TTL incorporates by reference arguments made above on pages 25 and 26 pertaining to Commerce's PMS finding for solar wafer inputs. As explained, TTL was selected a mandatory respondent because its imports reflected [      ] of subject merchandise production for Thailand. Respondent Selection Memo, at 3. Accordingly, Commerce cannot reasonably reject TTL's

38

sourcing patterns for solar glass when, by Commerce's own logic, TTL's experience *is* the Thai market as a whole. Relatedly, Commerce determination that "a circumstance or set of circumstances existed" that may have impacted TTL's production of subject merchandise is unsupported by the record when TTL's solar glass purchases were unaffected by the alleged "circumstance," *i.e.*, China's "dominance" of solar inputs in the Thai market. Post-Prelim PMS Memo, at 20.

In short, Commerce's explanation that "the prices that TTL paid for solar glass in Thailand reflect the larger market conditions in Thailand for these inputs," is contradicted by the record. IDM, at 39. The vast majority of TTL's solar glass inputs were not sourced from either Thailand or China. *See* TTL Supp D Resp., at Ex. SD-4e. Thus, if there are some distorted "larger market conditions" in Thailand, TTL was unaffected by the alleged distortion because it purchased solar glass from entirely different markets, namely [

]. *Id.* Once again, Commerce must make an evidence-based finding for its proposition that the cost of solar glass inputs fails to reflect costs "in the ordinary course of trade." *See Wilmar Trading Pte Ltd.*, 675 F.Supp.3d at 1229–30. Commerce's finding here that the Thai market was distorted from Chinese dominance is plainly contradicted by the record showing non-China sourcing patterns for TTL.

### C. Commerce's Reliance on Eurostat Data under HTS 7007.19.80 as a Solar Glass Benchmark was Unreasonable

In selecting a benchmark for evaluating the presence of market distortion in Thailand for solar glass, Commerce relied on overinclusive, nonspecific Eurostat import data under HTS 7007.19.80, with an average import value of $2.45/kg. IDM, at 51. As a result, Commerce selected a benchmark representing a 288.89 percent markup from TTL's transactions disregarded solar glass input price. Post-Prelim PMS Memo, at 22. In making this decision, Commerce also

39

disregarded far more reliable, product-specific sources on the record, and its reasons for doing so lack merit.

In evaluating whether a market distortion exists for solar glass, Commerce selected import data under an 8-digit classification, HTS 7007.19.80, from the European Union. Yet, HTS 7007.19.80 is a broad basket category containing dissimilar products, including cell phone screen protectors and glass used for doors, automobiles, stoves, refrigerators, and washing machines." *See* "TTL's Response to PMS Request for Information," at Ex. HTS-2 (Nov. 21, 2024) ("TTL Nov. 21 Info"), P.R. 325–27, C.R. 143–47; TTL Dec. 9 RFI, at 6–7, Ex. GLASS-4. This HTS code encompasses significantly different products with varying thicknesses ranging from 0.4mm to 6.0mm. *Id.* The differences in price are attributable to differences in product characteristics and weight. For example, HTS 7007.19.80 includes iPad screen protectors with prices as high as $800/kg. Such higher priced types of products weighing only a few grams impose significant distortions on the average unit values. *See* "TTL's Rebuttal to Petitioner's Response to PMS Request for Information," at 3–8, Ex. 1 (Nov. 25, 2024), P.R. 332, C.R. 148– 49; TTL Nov. 21 Info, at Ex. HTS-2. Further, the thickness of glass is critical in determining end use and pricing. HTS 7007.19.80 includes tempered safety glass used in electronics, which can be as thin as 0.4mm, reflecting only 20% the weight of the glass used in solar modules (standardized between 2mm to 3.2mm thickness). See TTL Nov. 21 Info, at 9–10; *see also* "TTL's Verification Exhibits," at Ex. CV-6 (pp. 35, pp. 102) (Dec. 27, 2024), P.R. 383, C.R. 190–233. On the other hand, tempered glass used in windows or doors can be as thick as 10mm. *Id.*, at Ex. MEASURE-2. As such, product specificity and thickness of the glass is imperative for ensuring an accurate, non-distortive comparison.

Commerce's selection of EU import data under HTS 7007.19.80 reflecting a $2.45/kg benchmark price is further unsupported when compared to the other sources on the record. As shown below, Commerce selected benchmark was the outlier compared to other sources — it was by far the highest benchmark price on the record:

| Specific to Solar Glass | Producer | Market | Source | Solar Glass Type | POI Price (USD/kg) |
|---|---|---|---|---|---|
| Yes | Non-Chinese | Turkey | TDM[11] | HTS 7007.19.20011 & 7007.19.80015 | 0.70 |
| Yes | Non-Chinese | Turkey | Import Genius[12] | 2-3.2mm Solar Glass | 0.59 |
| No | Non-Chinese | Thailand | RTG OIE[13] | Flat Glass incl. Tempered Safety | 0.50 |
| Yes | Chinese & Non-Chinese | Global, non-China | PV Insights[14] | 2.0mm Solar Glass | 0.46 |
| Yes | Chinese & Non-Chinese | Global, non-China | PV Insights[15] | 3.2mm Solar Glass | 0.43 |
| No | Global | European Union | Eurostat | HTS 7007.19.80 | 2.45 |

Similar to its PMS analysis for solar wafers, Commerce's reliance on a high-priced benchmark resulted in a finding of distortion in the Thai market, even where no distortion actually existed. If Commerce had relied on a product specific benchmark representative of solar glass, it would not have found a PMS distortion. Indeed, the benchmarks on the record exclusive of Chinese prices, and specific to solar glass, ranged from $0.43 to $0.70/kg, significantly lower than Commerce's selected benchmark price of $2.45/kg. For reference, TTL's transactions disregarded solar glass price was $[    ]/kg. Prelim. Cost Memo, at Attach. 1A. Reliance on any one of these benchmarks compared to TTL's transactions disregarded solar price would have revealed that no cost-based PMS distortion exists for solar glass in the Thai market.

---

[11] See TTL Supp D Resp., at Appx. 5.
[12] See TTL Feb. 5 Info, at Ex. 10A.
[13] Id., at Ex. 11.
[14] Id., at Ex. 12.
[15] Id.

Commerce's explanations for declining to consider alternative and product-specific benchmarks on the record fall short. First, Commerce's reasons for rejecting global prices from PV Insights as a benchmark are factually incorrect. In its PMS decision, Commerce explained as follows:

> With regard to the PV Insights data, they include China produced solar glass, rendering these prices not the best data to use for our PMS analysis. Further, PV Insights data are priced in meters squared, requiring a conversion to kilograms resulting in an estimate. As discussed above, Commerce has previously avoided using data that are reported in units other than kilograms because converting to kilograms results in an estimate rather than an exact kilogram figure. Accordingly, Commerce prefers to use data that are expressed in kilograms.

Post-Prelim PMS Memo, at 19. Yet, Commerce's description of the PV Insights data is wrong. The PV Insights data *did* report pricing on a per kilogram basis. *See* TTL Supp D Resp., at Appx. 2.3A. Further, the PV Insights data *did* provide solar glass prices *exclusive* of China. *Id.* Any decision based on factual inaccuracies cannot be sustained as reasonable. *See Albemarle Corp. v. U.S.*, 931 F.Supp.2d 1280, 1214 (Ct. Int'l Trade 2013) (remanding Commerce's assigned margin that was based on factually incorrect findings). Commerce's basis for rejection here is therefore unsupported by the record.

In addition, Commerce's rejection of the PV Insights data here contradicts years of precedence in solar proceedings. From the sixth to the tenth administrative reviews of the countervailing duty order *Solar Cells from China*, Commerce consistently selected PV Insights over HTS-based import trade data as a benchmark source for valuing solar glass.[16] In these

---

[16] *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Preliminary Results of the Countervailing Duty Administrative Review, and Recission in Part; 2021*, 88 Fed. Reg. 88,575 (Dec. 22, 2023) and accompanying Preliminary Decision Memorandum (Dec. 18, 2023), at p. 22. (covering the 10th administrative review where Commerce selected solar glass data from PV Insights, finding that "{b}ecause the data published by 2021 PV Insights provide global monthly prices that are specific to solar glass, we find it appropriate to rely on this

proceedings, Commerce was selecting a Tier 2 benchmark pursuant to its countervailing duty regulations, which defines the Tier 2 benchmark as "a world market price." 19 C.F.R. § 351.511(a)(2)(ii). Commerce's reliance on PV Insights was further affirmed by the U.S. Court of International Trade. *See Changzhou Trina Solar Energy Co. v. United States*, 466 F.Supp.3d 1295-96 (Ct. Int'l Trade 2020). Taken together, Commerce had no reason to rely on overinclusive and unspecific HTS-based import data when PV Insights provides reliable global pricing data, specific to the input in question, with an established record of superiority.

Second, Commerce declined to consider both the TDM and Import Genius import data from Turkey, finding that they "reflected market conditions for a single country whereas the prices under HTS 3818.00[17] reflected a broad market average." IDM, at 51; Post-Prelim PMS

---

source for valuing respondents' purchases of solar glass, as we have in previous administrative reviews.").

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Preliminary Results of the Countervailing Duty Administrative Review, and Recission in Part; 2020*, 88 Fed. Reg. 1,355 (Jan. 10, 2023) and accompanying Preliminary Decision Memorandum (Jan. 3, 2023), at 27 (covering the 9th administrative review, "{c}onsistent with our practice of. . . relying on data that reflect the narrowest category of products encompassing the input products, we are using the world market prices (tier two) published by PV Insights.").

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 40,491 (Jul. 7, 2022) and accompanying Issues and Decision Memorandum (June 29, 2022), Comment 8, at p. 51 (covering the 8th administrative review, Commerce rejected HTS-based import data, finding that "PV Insights prices are specific to solar glass and that the UN Comtrade prices are not").

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Preliminary Results of the Countervailing Duty Administrative Review, and Recission in Part; 2018*, 86 Fed. Reg. 21,691 (Apr. 23, 2021) and accompanying Preliminary Decision Memorandum (Apr. 19, 2021), at 19 (covering the 7th administrative review, "Because the data published by PV Insights are global monthly prices for the entire POR and are specific to solar glass, we find that it is appropriate to rely on this data source when constructing the solar glass benchmark.")

*See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Results of the Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 79,163 (Dec. 9, 2020) and accompanying Issues and Decision Memorandum (Nov. 27, 2020), at Cmt. 7 (covering the 6th administrative review, selecting PV Insights as a benchmark for solar glass).

[17] While Commerce's memorandum references HTS 3818.00, the HTS code used for the solar wafer adjustments, it most likely meant to reference the HTS 7007.19.80, the HTS code relied upon for the solar glass adjustment.

Memo, at 19. Yet, once again, Commerce's regulations do not impose a requirement that a "broad international average price" be used as a benchmark. Under 19 C.F.R. § 351.416(d), Commerce is instructed to make a comparison to the "same input." Thus, specificity is the paramount consideration to ensure an accurate comparison to the "same input" is met. In the surrogate value context, this Court has noted, "{i}f a set of data is not sufficiently 'product specific,' it is of no relevance whether or not the data satisfy the other {surrogate value selection} criteria." *Taian Ziyang* Food, 783 F. Supp. 2d at 1330.

Further, while Commerce expresses a preference for "international prices," it fails to consider that solar glass is a niche product not produced globally. Unlike steel or other commodity PMS cases Commerce has evaluated, solar inputs are only produced in a handful of markets. *See* "TTL's Rebuttal to Petitioner's Wafer and Solar Glass Pricing Information," at Ex. 6 (Feb. 18, 2025), P.R. 411 (showing that only three EU countries produce solar glass). The import data for Turkey, from both Import Genius and TDM, represented prices specific to the same type of solar glass used by TTL. The record also shows that Turkey is a significant producer of solar cells and modules, and therefore is a significant importer of solar glass used in the production of subject merchandise. *See* TTL Supp D Resp., at Appx. 11 (showing 14.4 gigawatts of production). Here, data from a country that is a demonstrated solar glass producer is far more product-specific and reliable as a PMS comparison benchmark than nonspecific, overinclusive import data. Commerce has made no attempt to select a PMS benchmark that bears a "rational and reasonable relationship" to the actual input being valued." *Neimenggu Fufeng Biotechnologies Co. v. United States*, 816 F.Supp.3d 1356, 1368 (Ct. Int'l Trade 2026). Finally, Commerce's preference for "international prices" is simply just that— a preference. "{A} mere preference can never trump Commerce's paramount obligation under the statute—to

use the best available information to calculate dumping margins as accurately as possible."

*Zhengzhou Harmoni Spice Co., Ltd. v. U.S.*, 617 F.Supp.2d 1281, 1315 (Ct. Int'l Trade 2009)

(internal quotations omitted) citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191

(Fed. Cir. 1990); *Horner v. Jeffrey*, 823 F.2d 1521, 1531 (Fed. Cir. 1987).

Had Commerce relied on any of the product-specific, contemporaneous benchmarks on

the record — whether PV Insights global pricing data, TDM import statistics from Turkey, or

Import Genius twelve-digit HTS data specific to 2-3.2mm solar glass — it would have found no

meaningful gap between those benchmarks and TTL's transactions-disregarded solar glass price

of $**[        ]**/kg.  Instead, Commerce found a distortion because it selected an average unit value

from a data set that covers glass used in automobiles, washing machines, and cells phones.

Commerce's rejection of those superior sources, based on factually incorrect characterizations of

the record and unsupported preferences for broad international averages over product-specific

data, cannot be sustained.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant its Motion

for Judgment on the Agency Record and remand this case to Commerce with instructions

consistent with the points set forth in this Memorandum.

Respectfully submitted,

/s/ Jonathan M. Freed
Jonathan M. Freed
MacKensie R. Sugama
**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, DC 20003
(202) 223-3760
jfreed@tradepacificlaw.com

Dated:  May 11, 2026                    Counsel for Plaintiffs *TTL and MLT*

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel hereby certify that the Memorandum of Law in Support of

Plaintiffs' Motion for Judgment Upon the Agency Record, dated May 11, 2026, complies with

the word-count limitation described in the Standard Chambers Procedures and Scheduling Order.

The Memorandum of Law contains 13,938 words according to the word-count function of the

word-processing software used to prepare the Memorandum.

Respectfully submitted,

/s/ Jonathan M. Freed

Jonathan M. Freed
MacKensie R. Sugama
**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, DC  20003
(202) 223-3760
jfreed@tradepacificlaw.com

*Counsel for Trina Solar Science & Technology
(Thailand) Ltd. and M.L.T. Solar Energy
Products Co., Ltd.*

Dated: May 11, 2026