**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

CANADIAN SOLAR INTERNATIONAL LTD., CANADIAN SOLAR MANUFACTURING (THAILAND) CO., LTD., CANADIAN SOLAR US MODULE MANUFACTORING CORP., AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE, TRINA SOLAR SCIENCE & TECHNOLOGY (THAILAND), AND M.L.T. SOLAR ENERGY PRODUCT CO., LTD.,

Plaintiffs and Consolidated Plaintiffs,

v.

UNITED STATES,

Defendant,

and

AMERICAN ALL. FOR SOLAR MANUFACTURING TRADE COMMITTEE,

Defendant-Intervenor.

Consol. Court No. 25-00159

**ORDER**

Upon consideration of the parties' motions for judgment upon the agency record, defendant's response thereto, and all other pertinent papers, it is hereby

ORDERED that the motions are denied, and it is further

ORDERED that judgment shall enter in favor of the United States.

Dated:_____________, 2026
New York, N.Y.

___________________________
JUDGE

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

CANADIAN SOLAR INTERNATIONAL LTD., CANADIAN SOLAR MANUFACTURING (THAILAND) CO., LTD., CANADIAN SOLAR US MODULE MANUFACTORING CORP., AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE, TRINA SOLAR SCIENCE & TECHNOLOGY (THAILAND), AND M.L.T. SOLAR ENERGY PRODUCT CO., LTD.,

Plaintiffs and Consolidated Plaintiffs,

v.

UNITED STATES,

Defendant,

and

AMERICAN ALL. FOR SOLAR MANUFACTURING TRADE COMMITTEE,

Defendant-Intervenor.

**PUBLIC VERSION**

Contains Redacted Business Proprietary Information on pages 4, 7, 10, 12-18, 22-24, 30-31, 36, 50-51

Consol. Court No. 25-00159

**DEFENDANT'S RESPONSE TO PLAINTIFFS' AND CONSOLIDATED PLAINTIFFS' RULE 56.2 MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

JONATHAN D. GUYNN
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:

PAUL THORNTON
Attorney
Office of Chief Counsel
For Trade Enforcement & Compliance
Department of Commerce

BLAKE W. COWMAN
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 353-2494

November 17, 2026

*Attorneys for Defendant*

# TABLE OF CONTENTS


STATEMENT PURSUANT TO RULE 56.2 .......... 2

I. The Administrative Determination Under Review .......... 2

II. Issues Presented for Review .......... 2

STATEMENT OF FACTS .......... 3

I. Initiation of Less-Than-Fair Value Investigation and Respondent Selection .......... 3

II. Preliminary Determination .......... 6

III. Post-Preliminary Determination .......... 6

IV. Final Determination .......... 7

SUMMARY OF ARGUMENT .......... 7

ARGUMENT .......... 8

I. Standard of Review .......... 8

II. Commerce's Decision to Select A Single Mandatory Respondent is Supported by Substantial Evidence and in Accordance with the Law .......... 10

A. Legal Framework .......... 11

B. Commerce's Decision to Individually Examine Trina Was Supported by Substantial Evidence and in Accordance with Law .......... 13

C. The Alliance's Arguments to the Contrary Fail .......... 17

D. Commerce Properly Considered Resource Constraints and Related Statutory Deadlines in Determinations .......... 19

III. Commerce's Adjustments Under the Major Input Rule and the Transactions Disregarded Rule Are Supported by Substantial Evidence .......... 20

A. Commerce Reasonably Relied on Thai Import Data Under HTS 3818.00 As a Benchmark for Valuing Solar Wafers .......... 21

B. Commerce Properly Adjusted Trina's COP .......... 23

C. Commerce Reasonably Decided Not to Rely on Thai Import Data in Applying the Transactions Disregarded Rule to Tin Ribbon .......... 29

IV. Commerce's Determination That a Cost-Based PMS Exists in Thailand Is Supported by Substantial Evidence and In Accordance with Law .......... 35

A. Legal Framework .......... 35

B. Commerce's Weighing of Record Evidence in Finding Distortions in Thailand's Solar Inputs Market Is Supported by Substantial Evidence and In Accordance with Law .......... 39

C. Commerce's Finding That Distortions in Solor Input Prices Were Particular to Thailand Is Supported by Substantial Evidence and In Accordance with Law .......... 42

E. Commerce Provided a Meaningful Opportunity for the Parties to Comment on the PMS Determination ..... 44

F. Commerce's PMS Benchmark Selection for Solar Wafers Was Supported by Substantial Evidence ..... 46

G. Commerce's PMS Benchmark Selection for Solar Glass was Supported by Substantial Evidence ..... 50

V. Commerce's PMS Adjustment is Supported by Substantial Evidence and is in Accordance with Law ..... 52

CONCLUSION ..... 55

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ancientree Cabinet Co. v. United States*,
532 F. Supp.3d 1241 (Ct. Int'l Trade 2021) .................... 26

*Atl. Sugar, Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984).................... 8

*Best Mattresses Int'l Co. v. United States*,
622 F. Supp.3d 1356 (Ct. Int'l Trade 2023) .................... 21, 29, 30

*Best Mattresses Int'l Co. v. United States*,
703 F. Supp.3d 1382 (Ct. Int'l Trade 2024) .................... 28, 30

*Ceramica Regiomontana, S.A. v. United States*,
810 F.2d 1137 (Fed. Cir. 1987).................... 9

*Clearon Corp* v. United States,
No. 13-00073, 2014 WL 3643332 (Ct. Int'l Trade July 24, 2014).................... 25

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938).................... 8, 43

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966).................... 8, 45

*Dorbest Ltd. v. United States*,
462 F.Supp.2d 1262 (Ct. Int'l Trade 2006) .................... 52

*E.I. DuPont de Nemours & Co. v. United States*,
No. 96-11-02509, 1998 WL 42598 (Ct. Int'l Trade Jan. 29, 1998).................... 25

*Ellwood City Forge Co. v. United States*,
834 F. Supp. 3d 1304 (Ct. Int'l Trade 2026) .................... 21

*Ellwood City Forge Co. v. United States*,
841 F. Supp. 3d 104 (Ct. Int'l Trade 2026) .................... 36, 37, 42, 52

*Ellwood II*,
841 F. Supp. 3d .................... 36

*Essar Steel Ltd. v. United States*,
678 F.3d 1268 (Fed. Cir. 2012).................... 10

*Goldlink Indus. Co. v. United States*,
431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) .......... 9, 45

*Husteel Co., Ltd. v. United States*,
426 F. Supp.3d 1376 (Ct. Int'l Trade 2020) .......... 38, 40, 42

*INS v. Elias-Zacarias*,
502 U.S. 478 (1992) .......... 9

*JBF RAK LLC v. United States*,
991 F. Supp. 2d 1343 (Ct. Int'l Trade 2014) .......... 44

*Jiangsu Senmao Bamboo & Wood Indus. Co., Ltd. v. United States*,
769 F. Supp.3d 1344 (Ct. Int'l Trade 2025) .......... passim

*Jiaxing Brother Fastener Co., Ltd. v. United States*,
428 F. Supp.3d 1364 (Ct. Int'l Trade 2020) .......... 26

*Kisan Die Tech Private Ltd. v. United States*,
665 F. Supp. 3d 1364 (Ct. Int'l Trade 2023) .......... 17, 18

*Nation Ford Chemical Co. v. United States*,
166 F.3d 1373 (Fed. Cir. 1999) .......... 28

*NEXTEEL Co., Ltd. v. United States*,
28 F.4th 1226 (Fed. Cir. 2022) .......... 36

*NEXTEEL II* and *Hyundai Steel Co.* v. *United States*,
19 F.4th 1346 (Fed. Cir. 2021) .......... 36, 37, 39

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006) .......... 9

*NMB Sing. Ltd. v. United States*,
557 F.3d 1316 (Fed. Cir. 2009) .......... 21

*Nucor Corp. v. United States*,
612 F.Supp.2d 1264 (Ct. Int'l Trade 2009) .......... 9

*PSC VSMPO-Avisma Corp. v. United States*,
688 F.3d 751 (Fed. Cir. 2012) .......... 10, 44

*PT. Zinus Global Indonesia v. United States*,
628 F. Supp.3d (Ct. Int'l Trade 2023) .......... 29

*Qingdao Sea-Line Trading Co. v. United States*,
766 F.3d 1378 (Fed. Cir. 2014) .......... 46

*Qingdao Taifa Group Co. v. United States*,
780 F. Supp.2d 1342 .......... 25, 50

*SeAH Steel Corp. v. United States*,
513 F. Supp.3d 1367 (Ct. Int'l Trade 2021) .......... 37, 42

*Shakeproof Assembly Components v. United States*,
268 F.3d 1376 (Fed. Cir. 2001) .......... 28

*Shandong Huarong Gen. Corp. v. United States*,
159 F. Supp. 2d 714 (Ct. Int'l Trade 2001) .......... 9

*Sichuan Changhong Elec. Co. v. United States*,
460 F. Supp.2d 1338 (Ct. Int'l Trade 2006) .......... 26

*SolarWorld Americas, Inc. v. United States*,
962 F.3d 1351 (Fed. Cir. 2020) .......... 26, 27

*Tenaris Bay City, Inc. v. United States*,
745 F. Supp. 3d 1336 (2024) .......... 25

*Timken Co. v. United States*,
699 F. Supp. 300 (Ct. Int'l Trade 1988) .......... 9

*Timken Co. v. United States*,
968 F. Supp.2d 1279 (Ct. Int'l Trade 2014) .......... 44

*Trust Chem Co. v. United States*,
791 F. Supp. 2d 1257 (Ct. Int'l Trade 2011) .......... 26

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Counsel, Inc.*,
435 U.S. 519 (1978) .......... 44

*Vulcan Threaded Products Inc. v. United States*,
311 F. Supp.3d 1357 (Ct. Int'l Trade 2018) .......... 25

*Wheatland Tube Co. v. United States*,
161 F.3d 1365 (Fed. Cir. 1998) .......... 9

*YC Rubber (North America) LLC v. United States*,
711 F. Supp. 3d 1387 (Ct. Int'l Trade 2024) .......... passim

*YC Rubber Co. (N. Am.) LLC v. United States*,
788 F. Supp.3d 1296 (2025) .......... 16, 17

*YC Rubber Co. (North America) LLC v. United States*,
No. 21-1489, 2022 WL 3711377 (Fed. Cir. Aug. 29, 2022) .......... passim

*Zhejiang Dunan Hetian Metal Co. v. United States*,
652 F.3d 1333 (Fed. Cir. 2011)........................................................................................ 50

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)........................................................................................ 8

19 U.S.C. § 1667b(f)(2) ........................................................................................ 29, 30

19 U.S.C. § 1673d(c)(5)........................................................................................ 16

19 U.S.C. § 1673d(c)(5)(A) ........................................................................................ 11, 12, 15, 17

19 U.S.C. § 1675(a)(3)(A) ........................................................................................ 19

19 U.S.C. § 1677(15) ........................................................................................ 35

19 U.S.C. § 1677b........................................................................................ 28, 35, 46

19 U.S.C. § 1677b(3) ........................................................................................ 47

19 U.S.C. § 1677b(c)(1) & (5) ........................................................................................ 28, 33

19 U.S.C. § 1677b(e) ........................................................................................ 36, 38, 41

19 U.S.C. § 1677b(e)(3)........................................................................................ 51

19 U.S.C. § 1677b(f)(2) ........................................................................................ passim

19 U.S.C. § 1677b(f)(2)-(3) ........................................................................................ 20, 27

19 U.S.C. § 1677b(f)(3) ........................................................................................ 20, 33

19 U.S.C. § 1677e........................................................................................ 16

19 U.S.C. § 1677e(c)(1)........................................................................................ 19, 20

19 U.S.C. § 1677f-1(c)........................................................................................ 13, 14

19 U.S.C. § 1677f-1(c)(1)–(2) ........................................................................................ 10, 11

19 U.S.C. § 1677f-1(c)(2)(B)........................................................................................ 11, 13, 15

19 U.S.C.§ 1677f-1(c)(2) ........................................................................................ 11, 13, 14, 19

**Regulations**

19 C.F.R. § 351.109(f)(2)(i)........................................................................................ 16

19 C.F.R. § 351.204(c)(2) ........ 19

19 C.F.R. § 351.404(c)(2)(i) ........ 51, 52

19 C.F.R. § 351.407(b) ........ 20, 21

19 C.F.R. § 351.416 ........ 38, 39, 43

19 C.F.R. § 351.416(a) ........ 37

19 C.F.R. § 351.416(d) ........ 41, 51

19 C.F.R. § 351.416(d)(1) ........ 37

19 C.F.R. § 351.416(d)(1)(ii)-(iii) ........ 39

19 C.F.R. § 351.416(d)(1)(iii) ........ 39, 40

19 C.F.R. § 351.416(d)(2) ........ 37, 39, 45

19 C.F.R. § 351.416(d)(3)(i) ........ 46, 47

19 C.F.R. § 351.416(d)(4) ........ 37, 38, 39

19 C.F.R. § 351.416(e) ........ 42, 43

19 C.F.R. § 351.416(e)(1) ........ 37

19 C.F.R. § 351.416(e)(ii) ........ 43, 45

19 C.F.R. § 351.416(f) ........ 38

19 C.F.R. § 351.416(f)(2) ........ 52

19 C.F.R. § 351.416(g) ........ 38, 39

19 C.F.R. § 351.416(g)(1) ........ 38, 42

19 C.F.R § 351.416(e)(1)(ii) ........ 38, 42

**<u>Other Authorities</u>**

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Inves*tigations,
89 Fed. Reg. 43,809 (Dep't of Commerce May 20, 20 ........ 3

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Malaysia: Affirmative Preliminary Determination of Sales at Less Than F*air Value, 89 Fed. Reg. 96,207 (Dep't of Commerce Dec. 4, 2024) ........ 46

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Thailand: Final Affirmative Determination of Sales at Less-Than-Fair-Value and Final Affirmative Determination of Critical Circ*umstances, 90 Fed. Reg. 17,395 (Dep't of C........ 2

*Diamond Sawblades and Parts Thereof from the People's Republic of China; Final Results of Antidumping Duty Administrative Review;* 2012–2013, 80 Fed. Reg. 32344 (Dep't of Commerce June 8, 2015) ........ 51

*Final Results of Antidumping Duty Administrative Review: Silicomanganese from Brazil*, 69 Fed. Reg. 13813 (Dep't of Commerce Mar. 24, 2004) ........ 29

*Mattresses from Cambodia: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circ*umstances, 86 Fed. Reg. 15,894 (Dep't Commerce Mar. 25, 2021) ........ 22, 23

*Preliminary Affirmative Determination of Sales at Less Than Fair Value, Affirmative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional* Measures, 89 Fed. Reg. (Dep't of Commerce Dec. 4, 2024) ........ 3

*Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing* Duty Laws, 89 Fed. Reg. 20766 (Dep't of Commerce March 25, 2024) ........ 36, 52

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

CANADIAN SOLAR INTERNATIONAL LTD., CANADIAN SOLAR MANUFACTURING (THAILAND) CO., LTD., CANADIAN SOLAR US MODULE MANUFACTORING CORP., AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE, TRINA SOLAR SCIENCE & TECHNOLOGY (THAILAND), AND M.L.T. SOLAR ENERGY PRODUCT CO., LTD.,

Plaintiffs and Consolidated Plaintiffs,

v.

UNITED STATES,

Defendant,

and

AMERICAN ALL. FOR SOLAR MANUFACTURING TRADE COMMITTEE,

Defendant-Intervenor.

**PUBLIC VERSION**

Contains Redacted Business Proprietary Information on pages 4, 7, 10, 12-18, 22-24, 30-31, 36, 50-51

Consol. Court No. 25-00159

**DEFENDANT'S RESPONSE TO PLAINTIFFS' AND CONSOLIDATED <u>PLAINTIFFS' RULE 56.2 MOTIONS FOR JUDGMENT ON THE AGENCY RECORD</u>**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, defendant, the United States, respectfully responds to the motions for judgment on the agency record filed by plaintiffs and consolidated plaintiffs, American Alliance for Solar Manufacturing Trade Committee (Alliance), Trina Solar Science & Technology (Thailand) Ltd. (Trina), and Canadian Solar International Limited and Canadian Solar Manufacturing (Thailand) Co., Ltd.

CSIL (CSIL). These parties challenge the Department of Commerce's (Commerce) final determination in the less-than-fair-value (LTFV) investigation of crystalline silicon photovoltaic (CSPV) cells from Thailand. Because Commerce's determination is supported by substantial evidence and is in accordance with law, we respectfully request that the Court sustain Commerce's final determination and deny plaintiffs' respective motions for judgment on the agency record.

## STATEMENT PURSUANT TO RULE 56.2

### I. The Administrative Determination Under Review

The LTFV investigation under review is *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Thailand: Final Affirmative Determination of Sales at Less-Than-Fair-Value and Final Affirmative Determination of Critical Circumstances*, 90 Fed. Reg. 17,395 (Dep't of Commerce April 25, 2025) (final determination) (P.R. 451),[1] and accompanying Issues and Decision Memorandum (IDM) (P.R. 448). The period of investigation (POI) is April 1, 2023, through March 31, 2024.

### II. Issues Presented for Review

1. Whether Commerce's selection of Trina as the sole mandatory respondent is in accordance with law and supported by substantial evidence.
2. Whether Commerce's applications of the Major Input Rule and Transactions Disregarded Rule are in accordance with law and supported by substantial evidence.
3. Whether Commerce correctly found the existence of and adjusted for a particular market situation (PMS) affecting solar inputs.

---

[1] Citations to the public record (P.R.) and confidential record (C.R.) refer to the record of the underlying investigation.

## STATEMENT OF FACTS

### I. Initiation of Less-Than-Fair Value Investigation and Respondent Selection

On April 24, 2024, Commerce received an antidumping duty (AD) petition from the Alliance concerning imports of crystalline silicon photovoltaic (CSPV) cells from Cambodia, Malaysia, Thailand, and Vietnam. *See* IDM at 2. On May 14, 2024, Commerce initiated the LTFV investigation on CSPV cells from Thailand, with the period of investigation (POI) covering April 1, 2023, through March 31, 2024. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 89 Fed. Reg. 43,809 (Dep't of Commerce May 20, 2024) (*Initiation Notice*) (P.R. 60). Commerce stated that it intended to select respondents based on the responses to quantity and value (Q&V) questionnaires issued to potential respondents. *See Initiation Notice*, 89 Fed. Reg. at 43,813. Commerce identified 23 potential exporters or producers of the subject merchandise under consideration and subsequentially issued Q&V questionnaires to 15 of them with complete contact information. *See Crystaline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from Thailand: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Affirmative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 89 Fed. Reg. 92,214 (Dep't of Commerce Dec. 4, 2024) (Preliminary Determination), and accompanying Preliminary Decision Memorandum (PDM), at 2 (P.R. 367). On June 17, 2024, Commerce confirmed the delivery of the Q&V questionnaires to eight of the 15 that were issued. *Id.*

Commerce "received timely filed Q&V questionnaire responses from seven exporters and producers of the merchandise under consideration." Respondent Selection Memorandum (Dep't

of Commerce June 21, 2024) (RSM) at 2, (C.R. 39), (P.R. 143). Based on the responses to the Q&V questionnaires, Commerce found that there were only [ ] companies exporting subject merchandise during the POI, Trina and Talesun Solar Technologies Thailand (Talesun). *See* RSM at Attachment. On June 21, 2024, Commerce selected Trina as the sole mandatory respondent in this investigation because it was found to be the exporter/producer who accounted for the majority of the market share, according to the Q&V questionnaire responses received. *See* IDM at 8; PDM at 2; RSM at 6. In this particular instance Trina "account{ed} for the overwhelming majority of imports" of subject merchandise during the POI among the selected companies that responded to the Q&V questionnaires in a timely manner. *See* IDM at 8. In fact, Trina's imports "account{ed} for [ ] of such imports during the POI." RSM at 6 and Attachment. Trina's importation of the subject merchandise accounted for [ ] of the total entry volume and [ ] of quantity of watts, as found in the Q&V questionnaire responses. *Id.* Meanwhile, Talesun's importation of the subject merchandise accounted for [ ] of the total entry volume and ] of quantity of watts. *Id.*

Commerce determined that because of this overwhelming market share, Trina could be reasonably examined as the sole mandatory respondent "in light of resource constraints and statutory requirements." *See* IDM at 8. In this sense, Commerce determined that due to the significant workload of the Enforcement and Compliance Office, and the constraint of having a sufficient number of analysts, it would not be practicable to investigate and determine individual weighted average dumping margins for each known exporter and producer of the subject merchandise. *See* RSM at 5. Thus, Commerce selected Trina as the sole mandatory respondent. *See* RSM.

On July 9, 2024, Trina notified Commerce that it did not have a viable home market or third-country market during the POI for purposes of determining normal value (NV). *See* PDM at 15. On September 19, 2024, the Alliance alleged that a PMS existed with respect to non-market economy (NME) inputs purchased by Trina from China. *See* PMS Allegation (Sept. 19, 2024) (P.R. 216, C.R. 65). Trina timely filed rebuttal factual information in response and comments concerning the Alliance's PMS allegations. PDM at 4-5. On November 19, 2024, Commerce requested POI export average units for solar glass. *Id.* On November 21, 2024, Alliance and Trina submitted information in response to Commerce's request. *Id.*

On September 20, 2024, the Alliance timely filed an allegation that a PMS existed in Thailand, and Commerce issued its PMS memorandum on March 24, 2025, in which it found that a cost-based PMS existed during the POI regarding the prices Trina paid for solar wafers and solar glass. *See* PMS Narrative Letter (Sept. 20, 2024) (P.R. 216-34, C.R. 65-83); Post-Prelim PMS Analysis (Mar. 23, 2025) (P.R. 426, C.R. 272). After inviting parties to comment on its PMS analysis, Commerce received PMS case briefs on March 31, 2025, and PMS rebuttal briefs on April 4, 2025. *See* Petitioner's Letter in Lieu of PMS Case Brief (March 31, 2025) (P.R. 435, C.R. 227-28); Canadian Solar PMS Case Brief (March 31, 2025) (P.R. 436, C.R. 279); Trina PMS Case Brief (March 31, 2025) (P.R. 437, C.R. 280); Petitioner PMS Rebuttal Brief (Apr. 7, 2025) (P.R. 442, C.R. 282)

On October 10, 2024, Commerce invited parties to submit constructed value (CV) profit and selling expense information. PDM at 5. Between October 18, and October 28, 2024, interested parties submitted CV profit and selling expenses information and rebuttal information. *Id.*

## II. Preliminary Determination

On December 4, 2024, Commerce released the preliminary determination, preliminarily finding that CSPV cells from Thailand for being sold for LTFV in the United States. *See* PDM at 1-2.

In its preliminary determination, Commerce explained that it based normal value (NV) on CV for Trina because Trina did not have a viable home or third-country market. PDM at 14. Commerce calculated CV based on the sum of Trina's cost of materials (COM) and fabrication employed in producing the subject merchandise, plus amounts for general and administrative (G&A) financial expenses, CV profit, selling expenses, and U.S. packing costs. *Id.* Further, Commerce determined CV profit and selling expenses based on "any other reasonable method." *Id.* at 15.

Regarding the PMS issue, Commerce explained that it accepted the Alliance's PMS allegation and information on the record and that it intended to address the issue in the post-prelim analysis memorandum. *Id.* at 23.

## III. Post-Preliminary Determination

On March 24, 2024, Commerce preliminarily determined that a cost-based PMS existed in Thailand. *See* Post-Preliminary Decision Memorandum (Dep't of Commerce March 24, 2025) (Post-Prelim) at 1-2, (P.R. 426), (C.R. 272). Commerce found it more likely than not that China's dominance of the solar cell input market in Thailand and China's status as an NME country during the POI distorted Thailand's domestic price of solar inputs, a significant input of CSPV cells, thereby contributing to the distortion of the production costs of CSPV cells. *See id* at 20. In support of its affirmative cost-based PMS finding, Commerce cited evidence placed on the record by the Alliance in the PMS allegation. *See id*. at 16 (citing Petitioner's PMS

Allegation (September 20, 2024) at 5-11, (P.R. 216-34), (C.R. 65-83)). This evidence showed China's dominance of both cell capacity and production compared to the rest of world, China's dominance of the global production of silicon wafers and solar glass and imports of these inputs into Thailand, and the fact that Chinese wafer and solar glass companies are state-owned (*i.e.*, NME country). *Id.*

## IV. Final Determination

On April 18, 2024, Commerce issued its final determination. *See* IDM. Commerce made one primary change in the final determination. *Id.* at 4. Commerce adjusted Trina's COP to account for its finding that a PMS existed in Thailand based on sales of Chinese solar inputs to Thailand. Commerce also made certain changes to Trina's COP and sales data based on its findings at verification. *Id.*

In the final determination, Commerce continued to apply the Major Input Rule and disregarded the wafer purchase prices and COP data from Trina's affiliated wafer suppliers. *See* IDM at 22-31. Additionally, Commerce continued to find a cost-based PMS and adjusted Trina's COP to account for its finding that a PMS existed in Thailand based on sales of Chinese solar inputs to Thailand and Trina. *Id.* at 31-52.

## SUMMARY OF ARGUMENT

The Court should sustain Commerce's final determination. First, Commerce's decision to limit its investigation to a single mandatory respondent is supported by substantial evidence and is in accordance with law because: (1) the facts and circumstances of this case fall outside the general rule of *YC Rubber* that a reasonable number of respondents is "generally more than one," *YC Rubber Co. (North America) LLC v. United States*, No. 21-1489, 2022 WL 3711377 (Fed. Cir. Aug. 29, 2022) (*YC Rubber*), because Trina alone accounts for [ ] of the

volume of subject merchandise from Thailand; and (2) Commerce's consideration of its resource constraints is consistent with its enforcement practice and statutory law.

Second, Commerce's adjustments under the Major Input Rule and the Transactions Disregarded Rule are supported by substantial evidence and is in accordance with law because: (1) Commerce selected the Thai import statistics because they represented the highest of transfer price, market price, and COP and was specific to the market under consideration, *i.e.*, Thailand; and (2) Commerce applied a reasonable method for establishing the market value for tin ribbon using Trina's own purchases of other inputs from the same affiliated supplier and from nonaffiliated suppliers.

Third, Commerce's finding that the existence of a PMS affecting the price of solar inputs and its determination to adjust Trina's reported costs to address the PMS affecting solar inputs was supported by substantial evidence and is in accordance with law because: (1) Thai import statistics and solar input prices demonstrate that the Thai market for solar inputs was distorted by Chinese overcapacity such that the price for Thai solar inputs was distorted and outside the ordinary course of trade; and (2) Commerce used a reasonable methodology based on record information to adjust its calculations to address those distortions. Thus, Commerce's final determination is in accordance with law and supported by substantial evidence.

## ARGUMENT

### I. Standard of Review

The Court will uphold Commerce's determination if it is supported by "substantial evidence on the record" and is otherwise "in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "more than a mere scintilla" of relevant and reasonable evidence to support the underlying conclusions. *Consol. Edison Co. v. NLRB*, 305

U.S. 197, 229 (1938). The requisite proof amounts to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" in light of "the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (footnote and internal quotation marks omitted).

That the Court may draw two inconsistent conclusions from the record "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966) (citation omitted). Rather, when Congress has entrusted an agency to administer a statute that demands inherently fact-intensive inquiries, the agency's conclusions may be set aside if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion. *See INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *accord Nucor Corp. v. United States*, 612 F.Supp.2d 1264, 1287 (Ct. Int'l Trade 2009).

Thus, "the Court will not disturb an agency determination if its factual findings are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusion." *Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d 714, 718 (Ct. Int'l Trade 2001); s*ee also Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) ("{T}he Court may not substitute its judgment for that of the {agency} when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." (citations and internal quotation marks omitted)); *Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988) (explaining that it is "not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record"). Hence, a party challenging Commerce's determination under the

substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (internal quotation marks omitted). Additionally, it is not necessary for Commerce to provide an explicit explanation where its path is reasonably discernible. *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369-70 (Fed. Cir. 1998) (citing *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987) ("A court may 'uphold {an agency's} decision of less than ideal clarity if the agency's path may reasonably be discerned.'" (citation omitted)).

Finally, "{t}he role of judicial review is limited to determining whether the record is adequate to support the administrative action." *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 761 (Fed. Cir. 2012) (*PSC VSMPO*); *see also Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012) (reversing the Court's order instructing Commerce to consider extra-record information because "the trial court's order usurps agency power, undermines Commerce's ability to administer the statute entrusted to it, contradicts important principles of finality, and discourages compliance.").

## II. Commerce's Decision to Select A Single Mandatory Respondent is Supported by Substantial Evidence and in Accordance with the Law

Contrary to the Alliance's argument, Commerce's determination to investigate a single mandatory respondent is supported by substantial evidence and is in accordance with both 19 U.S.C. § 1677f-1(c)(1)–(2) and *YC Rubber*. *YC Rubber*'s general rule that a reasonable number of respondents is "generally more than one" does not apply here because Trina alone accounts for an overwhelming majority—[ ]—of the volume of subject merchandise from the exporting country. Additionally, despite the Alliance's arguments that the plain meaning of the statute mandates that Commerce select more than one mandatory respondent, the statute and *YC*

*Rubber* itself do not support that reading. Thus, Commerce's determination to select Trina as the sole mandatory respondent in this AD investigation is supported by substantial evidence and in accordance with the law.

**A. Legal Framework**

If a large number of exporters and producers are involved in the investigation, Commerce may individually examine a reasonable number of exporters or producers, if examining all known exporters and producers is not practicable. 19 U.S.C. § 1677f-1(c)(2)(B). If that exception applies, Commerce may select as mandatory respondents the exporters or producers that represent the largest volume of subject merchandise from the exporting country. 19 U.S.C. § 1677f-1(c)(2)(B). The Federal Circuit has held that 19 U.S.C. § 1677f-1(c)(1)–(2) generally requires a reasonable number of companies be chosen as mandatory respondents by Commerce where it is not practicable to determine individual dumping margins for each individual company because of the number of exporters or importers. *See generally YC Rubber*, No. 21-1489 2022 WL 3711377. However, the statute does not mandate what constitutes a "reasonable number." 19 U.S.C.§ 1677f-1(c)(2). The Federal Circuit reasoned that, because Commerce uses an average of the mandatory respondents' dumping margins for the all-others rate, Commerce cannot use a single mandatory respondent for the all-others rate calculations without *demonstrating that it was otherwise reasonable*. *YC Rubber*, No. 21-1489, 2022 WL 3711377 at *3 ("The question is whether the statute permits Commerce to review a single exporter or producer when multiple have requested review and Commerce has not demonstrated that it was otherwise reasonable to calculate the all-others rate based on only one respondent."); *see also Jiangsu Senmao Bamboo & Wood Indus. Co., Ltd. v. United States*, 769 F. Supp.3d 1344, 1358 (Ct. Int'l Trade 2025) (*Senmao*) ("Defendant observes correctly that the Federal Circuit stated

that Commerce could rely on one mandatory respondent where Commerce 'demonstrated that it was otherwise reasonable' to do so to calculate the all-others rate.").

The statute provides that "estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated" excluding any zero and *de minimis* subsidy rates, and rates determined using adverse facts available. 19 U.S.C. § 1673d(c)(5)(A). The Federal Circuit's conclusion that a reasonable number of individually examined respondents for an investigation or review is "*generally* more than one" stems from both section 1673d(c)(5)(A)'s consideration of the weighted average all-others rate *and* the requirement of a "reasonable foundation" for the all-others rate applied to exporters and producers not individually examined. *YC Rubber*, No. 21-1489, 2022 WL 3711377 at *3-4 (emphasis added); *see also YC Rubber (North America) LLC v. United States*, 711 F. Supp. 3d 1387, 1395 (Ct. Int'l Trade 2024) (*YC Rubber Remand I* ). The Federal Circuit, however, left open the possibility of circumstances in which it can be appropriate to individually examine a single respondent. 2022 WL 3711377 at *4 ("{A} 'reasonable number' is generally more than one."); *see also YC Rubber Remand* I, 711 F. Supp. 3d at 1398, n. 13 (Ct. Int'l Trade 2024) (noting that the facts and circumstances of an investigation or review may necessitate the use of only one respondent's individually calculated rate in determining the all-others rate, albeit in unusual cases); *id.*, 711 F. Supp. 3d at 1398 (stating that since "the *YC Rubber II* court indicated with its use of the modifier 'generally,'" determining whether Commerce has an obligation to select and maintain multiple mandatory respondents "will require the agency to balance considerations such as the resources available to it, the speed with which it can identify another respondent, and the agency's deadlines for completing the segment"). To that end, this Court has recognized that, where a respondent

accounts for the "vast majority of exports," it may be reasonable to select a single mandatory respondent. *See Senmao*, 769 F. Supp.3d at 1359.

### B. Commerce's Decision to Individually Examine Trina Was Supported by Substantial Evidence and in Accordance with Law

Commerce's determination to select only one mandatory respondent, Trina, is supported by substantial evidence and in accordance with law because Trina accounts for the overwhelming majority—[ ]—of imports into the United States of the subject merchandise. RSM at 5 and Attachment; 19 U.S.C. § 1677f-1(c)(2)(B); *YC Rubber*, No. 21-1489, 2022 WL 3711377 at *4.

The Alliance does not contest that there is a "large number of exporters or producers involved in the investigation." 19 U.S.C. § 1677f-1(c)(2); Alliance Br. at 12-15. Nor does it challenge Commerce's use of the statutory exception to individually examine a reasonable number of exporters or producers. Alliance Br. at 12-15. Consistent with the statute, Commerce made its mandatory respondent selection based on which exporters or producers represent the largest volume of subject merchandise from the exporting country. 19 U.S.C. § 1677f-1(c)(2)(B); *see also* RSM at 6. The Federal Circuit stated that a reasonable number of mandatory respondents for Commerce to select is "generally more than one," and that the number of respondents is that which provides a "reasonable foundation" for the calculation of the all-others rate. *YC Rubber*, No. 21-1489, 2022 WL 3711377 at *3–4. The facts and circumstances of this investigation make it one of the "unusual cases" in which Commerce can select and reasonably examine one respondent that accounts for the overwhelming majority of the subject merchandise, [ ]. *YC Rubber Remand I*, 711 F. Supp.3d at 1397, n.12; *YC Rubber*, No. 21-1489, 2022 WL 3711377 at *4; *see also Senmao*, 769 F. Supp.3d at 1359.

Commerce complied with all statutory requirements during the respondent selection process. 19 U.S.C. § 1677f-1(c); RSM at 3–5. Although Commerce considered whether to determine individual AD rates for all known exporters and producers of solar cells—the petition identified 23 entities—it concluded that it was not practicable to do so due to the large number of exporters and producers. RSM at 4. Specifically, Commerce highlighted that in LTFV investigations, "{e}xamining all known exporters and producers would require significant resources for Commerce to analyze each company's corporate structure, accounting and selling practices, and production information." *Id.* Moreover, Commerce noted that verification would be mandatory because this segment was an investigation. *Id.* As a result, Commerce justified the application of the statutory exception that permits it to determine AD rates by reviewing a reasonable number of exporters or producers of the subject merchandise from the exporting country. 19 U.S.C. § 1677f-1(c)(2); RSM at 3–4.

Commerce based its selection of a reasonable number of respondents on the entities' responses to the Q&V questionnaires. RSM at 3, 5. Commerce issued Q&V questionnaires to exporters and producers of solar cells identified in the petition by the Alliance. *Id.* at 3. Out of the 15 exporters and producers to whom Commerce sent the questionnaires, seven provided a timely questionnaire response. *Id.* at 3. Of the seven exporters and producers who submitted responses, [ ] reported [ ] exports of solar cells to the United States. *Id.* at Attachment. Commerce explained how it applied its general practice of selecting "respondents accounting for the largest volume of the subject merchandise" during the POI. *Id.* at 6. The QV responses showed that [

]. *Id.* Commerce thus explained that its selection of Trina as the sole respondent was reasonable because:

> Trina Solar Thailand accounts for the overwhelming majority of imports from companies which responded to the Q&V questionnaire and that by examining this mandatory respondent, Commerce captures the largest volume of the subject merchandise from the exporting country that can be reasonably examined.

*Id.* It further explained that, at [ ], "not only does Trina Solar Thailand account for the overwhelming majority of imports of subject merchandise from companies which responded to the Q&V questionnaire, but it accounts for [ ] of such imports during the POI." *Id.*

This conclusion is fully consistent with *YC Rubber*. Trina accounting for [ ] of the total volume of subject merchandise is *exactly* the type of exceptional case the *YC Rubber* court anticipated. *Id.* at 5 and Attachment; 19 U.S.C. § 1677f-1(c)(2)(B); *YC Rubber*, No. 21-1489, 2022 WL 3711377 at *4. Moreover, *YC Rubber* was concerned with the calculation of a weighted average for the all-others rate and requiring a "reasonable foundation" for the rate. *YC Rubber*, No. 21-1489, 2022 WL 3711377 at *3–4; *YC Rubber Remand I*, 711 F. Supp.3d at 1395. The percentage of the total volume of exports that each individually examined respondent represents is foundational to the weighted average for the all-others rate; here, Trina alone is representative of [ ] of subject merchandise at [ ]. 19 U.S.C. § 1673d (c)(5)(A); RSM at Attachment. Therefore, the individually calculated rate for Trina provides a "reasonable foundation" for the all-others rate because it constitutes [ ]. *YC Rubber*, No. 21-1489, 2022 WL 3711377 at *3; 19 U.S.C. § 1673d (c)(5)(A); RSM at Attachment.

The *YC Rubber* Court's concern that Commerce did not provide an explanation for "why it would be reasonable to 'average' a single rate," is inapplicable here, as Commerce incorporated the above logic into this investigation. *YC Rubber*, No. 21-1489, 2022 WL

3711377 at *4; *see, e.g.*, RSM at 3–5. Moreover, since the selection of the all-others rate is determined through a weighted average, the potential selection of Talesun or another company would have little effect on the margin given that Trina's imports account for [ ] of the total volume of subject merchandise. *See* 19 U.S.C. § 1673d(c)(5)(A). In other words, Trina is representative of [ ] of total imports of the subject merchandise. RSM at 4 and Attachment. Furthermore, even if Commerce had selected another respondent, that does not guarantee that an average of the two respondents' rates would have been determined for the all-others rate. *See YC Rubber Co. (N. Am.) LLC v. United States*, 788 F. Supp.3d 1296, 1301-1302 (2025) (noting that five other potential respondents declined to participate); *see also* 19 C.F.R. § 351.109(f)(2)(i) (stating that "{i}f {Commerce} determines that only one individually investigated exporter or producer has a calculated weighted-average dumping margin … that is not zero, *de minimis,* or determined entirely under {19 U.S.C. § 1677e}, {Commerce} may apply that weighted-average dumping margin … as the all-others rate"); 19 U.S.C. § 1673d(c)(5) (stating that Commerce "may use any reasonable method to establish the estimated all-others rate").

Commerce provided additional reasoning for its decision beyond Trina's market share. The statute provides that the number of respondents is based on the number "{Commerce} determines can be reasonably examined," RSM at 6, and as discussed below, Commerce also relied on its resource constraints and related statutory deadlines.

Commerce's selection of only one mandatory respondent in this investigation is in accordance with law and supported by substantial evidence, and the Alliance's argument that it is "of no consequence" that Trina accounted for [ ] of imports of the subject merchandise is without merit. Alliance Br. at 12-14.

### C. The Alliance's Arguments to the Contrary Fail

Although the Alliance agrees that the statute does not define what a "reasonable number" of respondents is, the Alliance argues that the plain language of the statute requires Commerce to select at least two exporters or producers of the subject merchandise to be respondents. Alliance Br. at 12-14. The Alliance specifically contends that plural language in the statute evinces Congress's intent to require at least two respondents. *Id.* at 13. This argument fails for multiple reasons.

The Federal Circuit declined to adopt the Alliance's read of the statute in *YC Rubber*. Rather, the Court stated that a reasonable number of respondents is "*generally* more than one," with the "generally" qualifier indicating the plain language of the statute does not mandate that Commerce select a minimum of two respondents in all cases. *YC Rubber*, No. 21-1489, 2022 WL 3711377 at *3. Therefore, the Alliance's dispositive argument is contrary to Federal Circuit precedent, as this Court has repeatedly recognized when discussing *YC Rubber*. *See, e.g.*, *Senmao*, 769 F. Supp.3d at 1358 ("Defendant observes correctly that the Federal Circuit stated that Commerce could rely on one mandatory respondent where Commerce 'demonstrated that it was otherwise reasonable' to do so to calculate the all-others rate."); *YC Rubber Remand I*, 711 F. Supp.3d at 1398 (similar).

The Alliance also relies on the statutory language setting out a "weighted average" for calculating the all-others rate under section 1673d(c)(5)(A). Alliance Br. at 13-14. But here, unlike in *YC Rubber*, Commerce provided a "reason why it would be reasonable to 'average' a single rate," *YC Rubber*, 2022 WL 3711377 at *4, when it recognized that, at [ ], Trina "accounts for [ ] imports during the POI," RSM at 6, thus the inclusion of the

other [ ] in the weighted average would potentially have a minimal or non-existent effect on the resulting margin.

Finally, the Alliance relies on *Kisan Die Tech Private Ltd. v. United States*, 665 F. Supp. 3d 1364, 1379 (Ct. Int'l Trade 2023). Although *Kisan* rejected the selection of a single respondent on the basis that "an individual examination of the largest exporter and producer will account for a significant volume of subject merchandise during the POR," Commerce made that determination to rely on a single respondent before *YC Rubber* was decided, meaning, unlike here, Commerce did not have the opportunity to explain why it was compliant with the decision. *Id.* Moreover, rather than a "significant volume," *id.*, the single respondent here accounted for "the overwhelming majority" of imports, IDM at 8. In any event, the Alliance's read of *Kisan* fails to account for the nuances of *YC Rubber*, which were later reinforced by the *YC Rubber Remand I* decision. Alliance Br. at 12-14; *YC Rubber*, No. 21-1489, 2022 WL 3711377 at *3; *YC Rubber Remand I*, 711 F. Supp.3d at 1397, n.12. Notably, where a single mandatory respondent represents a "vast majority" of total exports, this Court has recognized that that could be a situation where Commerce may select a single mandatory respondent. *See Senmao*, 769 F. Supp.3d at 1359. While the Court in *Senmao* held that Commerce erred in relying on a single mandatory respondent in that specific case, that case involved a situation where the single mandatory respondent did not constitute an overwhelming majority, as is the case here. *Id.* at 1359-60 (not referring to the selected single mandatory respondent as constituting a majority, let alone a "vast majority"). And, as the *YC Rubber Remand I* decision recognized, "the Federal Circuit's inclusion of the modifier 'generally' as a recognition that there may be unusual cases"—such as the present—"in which Commerce establishes, from the outset, that it cannot "reasonably examine" more than one respondent." 711 F. Supp. 3d at 1397 n. 12.

Accordingly, reading the statute as requiring Commerce to always select multiple mandatory respondents even where Commerce demonstrates that it is otherwise reasonable to select a single mandatory is inconsistent with the Federal Circuit's holding in *YC Rubber* and this Court should therefore decline to find merit in the Alliance's statutory interpretation arguments.

### D. Commerce Properly Considered Resource Constraints and Related Statutory Deadlines in Determinations

Despite the Alliance's contention otherwise, *see* Alliance Br. at 15, Commerce's consideration of its resource constraints in respondent selection is consistent with both the statute and other aspects of Commerce's decision making. First, as set forth in the statute, Commerce must determine that it is *not practicable* to determine individual weighted-average dumping margins because of the large number of exporters or producers involved in the investigation. 19 U.S.C. § 1677f-1(c)(2); 19 C.F.R. § 351.204(c)(2). Because Commerce must consider the practicality of examining a large number of exporters or producers, Commerce inherently must consider its resource constraints or else there would be no exception, and Commerce would examine all known exporters or producers. Second, Commerce's consideration of its resource constraints is consistent with other aspects of its enforcement practice (*e.g.*, extension of preliminary and final results pursuant to 19 U.S.C. § 1675(a)(3)(A), deferrals of program findings to subsequent reviews in CVD proceedings, length of verification, corroboration of secondary information "to the extent practicable" pursuant to 19 U.S.C. § 1677e(c)(1), tolling of ongoing segments, *etc.*).

Here, Commerce explained that it was "conducting numerous concurrent and complex investigations and administrative reviews," including 25 separate examples. RSM at 5. Of these, four were investigations, which can be even more intensive than other intense segments of

proceedings because Commerce must learn the particular products at issue to establish the scope of the investigation and familiarize itself with another industry, including the foreign manufacturers and exporters. *Id.* Additionally, Commerce noted that Office IV, the office responsible for conducting this LTFV investigation, was "involved in ongoing litigation, including Court directed remand redeterminations, as well as multiple scope rulings, sunset reviews, changed circumstances reviews, and multiple circumvention inquiries." *Id.* Commerce explained that "{n}ot only do these other cases present a significant workload, but the deadlines for several of the cases coincide or overlap with anticipated deadlines in this proceeding." *Id.* Finally, Commerce stated that "because of the significant workload throughout Enforcement and Compliance, Office IV does not anticipate receiving any additional resources to devote to this investigation." *Id.* Thus, it is not inconsistent with either the statute or Commerce's broader practice for Commerce to consider resource constraints in respondent selection.

## III. Commerce's Adjustments Under the Major Input Rule and the Transactions Disregarded Rule Are Supported by Substantial Evidence

Commerce's decision to rely on Thai HTS 3818,00 as the reasonably available data to value COPs under the Major Input Rule under 19 U.S.C. § 1677b(f)(3) is supported by substantial evidence and in accordance with law. Commerce reasonably relied on Thai import data under HTS 3818.00 as a benchmark for valuing solar wafers because it represented the highest of transfer price, market price, and COP, and is the information specific to the "market consideration" on the record. Additionally, Commerce application of the Transactions Disregarded Rule under 19 U.S.C. § 1677b(f)(2) is supported by substantial evidence and in accordance with law. In applying the Transactions Disregarded Rule, Commerce reasonably made an adjustment to tin ribbon costs by constructing the market price of the input by

extrapolating the difference in prices of other inputs that Trina purchased from Trina's sole tin ribbon supplier and prices of the same inputs that Trina purchased from unaffiliated suppliers.

### A. Commerce Reasonably Relied on Thai Import Data Under HTS 3818.00 As a Benchmark for Valuing Solar Wafers

When calculating normal value, Commerce may substitute prices of transactions between affiliated parties under the transactions disregarded and Major Input Rules if it determines that the reported amounts do not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market or are below the COP. *See* 19 U.S.C. § 1677b(f)(2)-(3); 19 C.F.R. § 351.407(b) (outlining methods for valuing a major input). Similarly, Commerce's regulations provide that,

> {Commerce} normally will determine the value of a major input purchased from an affiliated person based on the higher of: (1) The price paid by the exporter or producer to the affiliated person for the major input; (2) The amount usually reflected in sales of the major input in the market under consideration; or (3) The cost to the affiliated person of producing the major input.

19 C.F.R. § 351.407(b). The purpose of the Major Input Rule is to ensure that Commerce's determination of the normal value of subject merchandise most accurately reflects the value of the input. *See Best Mattresses Int'l Co. v. United States*, 622 F. Supp.3d 1356, 1359 (Ct. Int'l Trade 2023) (*Best Mattresses I*) ("The underlying concern is that simply relying on the transaction purchase price for an input from an affiliated supplier ('transfer price'), without testing it against external measures of value, could be reflective of exporters' cost-sharing arrangements with affiliates or like distortions."); *Ellwood City Forge Co. v. United States*, 834 F. Supp. 3d 1304, 1317 (Ct. Int'l Trade 2026) (*Ellwood I*).

To determine whether Commerce's application of the Major Input Rule was reasonable, this Court has relied on Commerce's regulations, specifically 19 C.F.R. § 351.407(b), together

with Commerce's explanation of how it applied those regulations. *See Ellwood I*, 834 F. Supp. 3d at 1319 (citing *NMB Sing. Ltd. v. United States*, 557 F.3d 1316 (Fed. Cir. 2009)). During the POI, Trina purchased wafers that were a major input into the production of solar panels from various NME affiliated parties. Preliminary Cost Memorandum (Department of Commerce November 27, 2024), at 2 (PCM), (P.R. 360), (C.R. 168). In accordance with its regulations, Commerce compared the affiliated transfer price to the market values and to the affiliates' COP to determine the highest among the three amounts. *See id.*; 19 C.F.R. § 351.407(b). Due to the absence of affiliates' COP, Commerce derived the surrogate COP amount by using the HTS number specific inputs from the Trade Data Monitor (TDM) data, excluding NME countries and countries with export subsidies. PCM at 2. Commerce has found that similar data reported under a six-digit HTS to be reasonably specific for purposes of the Major Input Rule. *See Mattresses from Cambodia: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 86 Fed. Reg. 15,894 (Dep't Commerce Mar. 25, 2021), and accompanying IDM 9. Commerce used Malaysia, Turkey, Mexico, and Indonesia data because it pertained to countries at an economically comparable level of development as China and Vietnam. PCM at 2; *Mattresses from Cambodia* IDM at 9 ("Further, to narrow the request and given that the affiliated suppliers are from an NME Country, Commerce determined that was appropriate to solicit GTA data from countries economically similar to the affiliated suppliers' country."). As a result, Commerce calculated an adjustment to the reported cost of manufacture (TOCOM) of [ ] percent. PCM at 2.

During the POI, Trina purchased certain minor inputs, including [ ], [ ], [ ], and [ ] used to produce the subject merchandise from affiliated parties. *Id.* at 2-3. Accordingly, Commerce analyzed Trina's transactions in accordance with the

Transactions Disregarded Rule. After comparing Trina's reported POI transfer price to the weighted-averaged market prices, Commerce determined that the weighted-averaged market prices exceeded the transfer prices and weighted-averaged market prices. *Id.* at 3. Trina purchased [ ] tin ribbon from affiliated parties, and its affiliated supplier [ ]. Thus, Commerce reasonably determined that an adjustment was appropriate for the market price of tin ribbon. IDM at 29-30. Further, Commerce explained its practice that, where a respondent has no unaffiliated purchases, Commerce will rely on the affiliated party's sales of the input to unaffiliated parties, or any reasonable method for establishing market value. IDM at 29. Here, Trina purchased aluminum frames, EVA, and junction boxes from the same affiliated supplier that provided the tin ribbon. *Id.*

In the final determination, Commerce made adjustments for affiliated purchases of tin ribbon. IDM at 29. Commerce may analyze affiliated transactions to determine whether they were transacted at arm's length values. *Id.*

**B. Commerce Properly Adjusted Trina's COP**

Commerce properly adjusted Trina's COP to reflect the market price of wafers based on Thai import statistics as these data represented the highest of transfer price, market price, and COP. *See* PCM at 2. First, the statute requires the market price to be derived from information specific to the "market under consideration." 19 U.S.C. § 1677b(f)(2). Thus, Commerce first looks for purchases of input from unaffiliated suppliers or, if none exist, sales by the affiliated supplier to unaffiliated purchaser in the same market as the respondent.

Trina argues that Commerce's reliance on import data under HTS 3818.00 for valuing Trina's wafer input market price was unreasonable. Trina Br. at 9-15. Trina reported that it did

not purchase wafers from unaffiliated parties during the POI and that [ ]. *See* Section D Supplemental Questionnaire Response (Nov. 12, 2024) at SuppD-6 (P.R. 310-14), (C.R. 130-137). As a result, the record did not have any transactions that reflected a market price for wafers sold in Thailand that Commerce could use in its Major Input Rule analysis when examining the affiliate's COP. Thus, Commerce reasonably decided to use Thai import data under HTS 3818.00 as a proxy for the market price, in the absence of a reliable market price from Trina. *See Mattresses from Cambodia* IDM at 10. In *Mattresses from Cambodia*, Commerce similarly determined a surrogate market price after determining that all affiliated suppliers were located in an NME and explained that "the statute indicates that the item being tested should reflect a market price in the country under consideration." *Id.* There, Commerce ultimately determined a market price by using the HTS number-specific input from Cambodian Trademap data and explained that "the Trademap data represent{ed} country-specific export data" into the "market under consideration," *i.e.*, Cambodia. Here, Commerce used import data under HTS 3818.00 because it was specific to the market under consideration, *i.e.*, Thailand. *See* IDM at 28-31.

Trina asserts several errors by Commerce in relying on the HTS 3818.00 data, but each fails to demonstrate that Commerce's determination was unsupported by substantial evidence.

*1.* Trina first argues that Thai HTS 3818,00 data was "unrepresentative" and a "broad basket category of dissimilar products unrepresentative of solar-grade wafers." Trina Solar Br. at 11-13. Relatedly, Trina contends that the import data contains "anomalies" because the "data includes imports from countries with no solar wafer production." *Id.* at 13-15. However, the statute requires Commerce to derive a market price from information specific "to

the market under consideration;" and when no market price exists, that it look to "information available," about the input in the market under consideration. 19 U.S.C. § 1677b(f)(2). Here, during the administrative proceeding, no parties argued that wafers were not appropriately categorized under HTS 3818.00. *See* Alliance Rebuttal Brief (March 25, 2025,) at 31 (P.R. 431), (C.R. 276); Trina Case Br. (March 17, 2025) at 33 (P.R. 420), (C.R. 268).

Now, however, Trina argues that, in addition to solar-grade wafers, HTS 3818.00 includes *other* products and countries without solar wafer production. But this amounts to an argument that import data under HTS 3818.00 is imperfect, Trina Br. at 11-14, which is insufficient to show that Commerce's reliance on it was unsupported by substantial evidence. Instead, Commerce operates within the confines of administrative record before it, and need not "use perfect data so long as it explains why its choice was reasonable on the record." *Tenaris Bay City, Inc. v. United States*, 745 F. Supp. 3d 1336 (2024). Commerce has used similar data reported at the six-digit HTS level, finding it "reasonably specific" when applying the Major Input Rule. *Mattresses from Cambodia* IDM at 9. And Commerce explained why its choice was reasonable: because the import data under HTS 3818.00 includes wafer inputs in the market under consideration, *i.e.*, Thailand, and because the other proposed data was not acceptable as discussed below, Commerce has met its statutory obligations and acted within its practice. 19 U.S.C. § 1677b(f)(2); *Mattresses from Cambodia* IDM at 10.

*2.* Trina further asserts that since Commerce has rejected data under HTS 3818.00 as a solar glass wafer benchmark in prior investigations, it must do so again in this proceeding. Trina Solar Br. at 12-13. This Court has upheld Commerce's long-standing practice of treating each segment of an AD proceeding as an independent segment with a separate record that leads to independent determinations. *See E.I. DuPont de Nemours & Co. v. United States*, No. 96-11-

02509, 1998 WL 42598 (Ct. Int'l Trade Jan. 29, 1998); *Clearon Corp* v. United States, No. 13-00073, 2014 WL 3643332, at *9 (Ct. Int'l Trade July 24, 2014) ("Commerce is not required by statute or regulation to select the same surrogate country it did in previous reviews{.}"); *see also Qingdao Taifa Group Co. v. United States*, 780 F. Supp.2d 1342, 1350 ("Commerce is not required to justify its determination in terms of past alternatives."). When Commerce establishes, with substantial evidence, that a different dataset constitutes the best available information, this Court has rejected similar claims that Commerce is bound by a prior finding that a dataset is superior. *See Vulcan Threaded Products Inc. v. United States*, 311 F. Supp.3d 1357, 1367 (Ct. Int'l Trade 2018).

Although Commerce aims for consistent practice when establishing surrogate COPs, it must consider the data on the record before it and, if appropriate, it may use different data in the current administrative segment instead of data under HTS 3818.00 used in prior segments of AD proceedings. *See Jiaxing Brother Fastener Co., Ltd. v. United States*, 428 F. Supp.3d 1364, 1379-80 (Ct. Int'l Trade 2020) ("Although Commerce notes that it relies on the same NSO quarterly data to calculate labor hours as in the previous administrative review, {} the records of the two proceedings are not the same…The agency must make its determinations based on the record before it." (internal citations omitted)).

*3.* Trina continues by arguing that the import data under HTS 3818.00 is otherwise aberrational. *See* Trina Br. at 15-16. Though Commerce does not generally disregard import values "merely because they were the product of a small quantity of imported goods," it may disregard small quantity import values where they are distortive or aberrational. *Ancientree Cabinet Co. v. United States*, 532 F. Supp.3d 1241, 1253 (Ct. Int'l Trade 2021) (citing *Sichuan Changhong Elec. Co. v. United States*, 460 F. Supp.2d 1338, 1356 (Ct. Int'l Trade 2006)). When

considering whether an input's surrogate value is aberrational, Commerce will disregard "small quantity import data … when the per-unit value is substantially different from the per-unit values of the larger quantity imports of that product from other potential surrogate countries." *SolarWorld Americas, Inc. v. United States*, 962 F.3d 1351, 1358 (Fed. Cir. 2020) (citation modified). In this case, however, Trina has failed to demonstrate that the import data under HTS 3818.00 is aberrational. As Commerce explained, Trina merely points to the fact that a value is higher than others, which "is not sufficient grounds to exclude data as aberrational." IDM at 50 (citing *Trust Chem Co. v. United States*, 791 F. Supp. 2d 1257, 1264 (Ct. Int'l Trade 2011)). Moreover, as Commerce noted, it "found all other data sources on the record suffer from deficiencies that made them inappropriate for use in our PMS Analysis." *Id.*

*4.* Trina argues that Commerce failed to consider alternative benchmark sources for solar wafers, such as solar wafer costs from Hanwha Q Cells, TrendForce, and Clean Energy Associates ("CEA"). Trina Br. at 16-19. Although Trina contends that Commerce did not address this data, it explained in its PMS analysis that the data was unreliable because it included data from China. *See* IDM at 49 ("while the Hanwha pricing data are POI-specific and reflect sales to Malaysia, the data contain China produced wafer prices. Thus, they do not reflect prices paid for the same input under market-based circumstances."); *id.*; ("Commerce did not rely on the TrendForce pricing dataset because it is missing price data for almost half of the months of the POI and Commerce was unable to determine based on the record whether the TrendForce prices exclude Chinese production or reflect prices of sales to China."); IDM at 50 ("while CEA pricing data do not include China-produced wafers, sales prices are based on all markets in Southeast Asia, which presumably could include China, and the data do not specify whether China prices were included."). These alternative benchmark sources were therefore not suitable

to serve as benchmark because they are not specific to the market under consideration as required by the statute, not contemporaneous, or are distorted. *See* 19 U.S.C. § 1677b(f)(2). Unlike the HTS 3818 data, the alternative data sources do not represent broad market values, are unreliable and from biased sources, and lack reliable conversions to a per kilogram basis. *Id.* As a result, Commerce relied on the import data under HTS 3818.00, because the record shows that it is the broadest database available that is specific to the market under consideration, includes all reporting countries, and the information excludes data affected by the PMS. *Id.* Thus, for these reasons, Commerce reasonably decided not to rely or consider further the alternative data sources advocated by Trina.

The Federal Circuit has held that Commerce's selection will be upheld if it supported by substantial evidence and Commerce provides a reasonable explanation detailing why its chosen source is the "best available information" over the alternatives. *See Nation Ford Chemical Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (holding that 19 U.S.C. § 1677b and the best information available standard provides Commerce "discretion" and "flexib{ility}"); *see also Shakeproof Assembly Components v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001) (stating with respect to 19 U.S.C. § 1677b, "the critical question is whether the methodology used by Commerce is based on the best available information and establishes antidumping margins as accurately as possible"). Here, Commerce's selection is supported by substantial evidence, and Commerce explained why the data it selected is the best available information over the alternatives. *See* IDM at 28-31.

Relatedly, Trina asserts that Commerce erred by removing the countries that were either non-market economies or maintained export subsidies, because Commerce's decision resulted in removal of the largest wafer producing markets, *i.e.*, China, Vietnam, South Korea, and

Indonesia, under the Thai HTS. Trina Br. at 16-20. However, including these countries under HTS 3818.00 would have resulted in inclusion of distortions and violated Commerce's statutory obligations under 19 U.S.C. § 1677b(c)(1) & (5) (NMEs and countries with export subsidies). Moreover, HTS 3818.00 is already "reasonably specific" to wafers and, after removal of data from NMEs and countries with export subsidies, contains reliable data that is free of such distortions. *See Best Mattresses Int'l Co. v. United States*, 703 F. Supp.3d 1382, 1389 (Ct. Int'l Trade 2024) (*Best Mattresses II*) (Commerce stated that the court had explained "that there is a general presumption of NME unreliability which is derived from the statute as a whole and affirmed by Commerce practice."). First, because China is a NME country, Commerce is not able to consider the affiliated suppliers' COP. *See PT. Zinus Global Indonesia v. United States*, 628 F. Supp.3d 1258, 1232 (Ct. Int'l Trade 2023). Commerce's practice is to use data that is readily available and reasonably specific to the voluminous number of affiliated NME inputs. *See Best Mattresses I*, 622 F. Supp. 3d at 1376. This Court has explained that "nothing in the Major Input Rule obligates Commerce to proceed with an empty input COP value-considering the high percentage of affiliated suppliers based in an NME country, Commerce decision to calculate an estimate based on surrogate value was justified." *See Best Mattresses I*, 622 F. Supp. 3d at 1377.

Taken together, Commerce's choice of information to include in its Major Input Rule calculations was fully supported by substantial evidence.

### C. Commerce Reasonably Decided Not to Rely on Thai Import Data in Applying the Transactions Disregarded Rule to Tin Ribbon

Commerce's adjustments for affiliated purchases of tin ribbon were supported by substantial evidence and within its statutory obligations. Per 19 U.S.C. § 1667b(f)(2),

Commerce may analyze affiliated transactions to determine whether they were transacted at arm's length values. 19 U.S.C. § 1667b(f)(2); IDM at 29. Commerce has established a preference for using a respondent's own purchases of the inputs from unaffiliated parties as the arm's length or market value. *See* IDM at 29 (citing *Notice of Final Determination of Sales at Less Than Fair Value and Negative Critical Circumstances Determination: Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea*, 77 Fed. Reg.17413 (Dep't of Commerce Mar. 26, 2012), and accompanying IDM at Comment 17; *Final Results of Antidumping Duty Administrative Review: Silicomanganese from Brazil*, 69 Fed. Reg. 13813 (Dep't of Commerce Mar. 24, 2004), and accompanying IDM at Comment 7). Commerce's determination of the "market under consideration" is chosen on a case-by-case basis after analyzing factors involved and examining the available data. *Best Mattresses International Co. Limited v. United States*, 703 F. Supp.3d 1382 (Ct. Int'l Trade 2023).

In conducting transactions disregarded analysis under 19 U.S.C. § 1667b(f)(2), Commerce reasonably decided not to rely on Thai import data to establish the market price for tin ribbon. IDM at 29-30. As Commerce explained, during the POI, Trina purchased [ ] tin ribbon as well as purchased other inputs from an affiliated party, and [ ]. However, Trina purchased aluminum frames, EVA, and junction boxes from the same affiliated supplier that provided the tin ribbon and, significantly, the record contained market price for such inputs because Trina also purchased such inputs (aluminum frames, EVA and junction boxes) from unaffiliated parties. IDM at 29. Per Commerce's practice, where a respondent has no unaffiliated purchases, Commerce will rely on the affiliated party's sales of the input to unaffiliated parties, or any reasonable method for establishing market value. IDM at 29 (citing *Refrigerator-Freezers from Korea IDM* and

*Silicomanganese from Brazil*). Further, as Commerce explained, in previous cases with the same fact pattern, it relied on the difference between transfer and market price for inputs with market values to calculate the adjustment for the input without a market value when an affiliated party provides multiple inputs. *Id.* at 29-30. Commerce applied its established practice where "it looks to sales of the input between an affiliate supplier and an unaffiliated party," before, "as a final resort, {} a reasonable source for market value available on the record." *Best Mattresses I*, 622 F. Supp. 3d at 1383. Commerce determined that extrapolating the market price from the sales of other inputs was more accurate than the external market data. IDM at 30. ("because we are able to extrapolate a market value for tin ribbon based on Trina's own purchases of other inputs from the same affiliated party and from unaffiliated parties, that it did not find it necessary to resort to the use of publicly available data, *i.e.*, import values.") (citation modified). Accordingly, consistent with such prior administrative precedent, Commerce calculated the adjustment for tin ribbon without having to rely on import data for purposes of transactions disregarded analysis. *Id.* at 30.

Alliance argues that Commerce erred by not relying on Thai import data to estimate the market price of tin ribbon. These arguments should be rejected.

*1.* Alliance first contends Commerce erred in extrapolating the market price for tin ribbon by adjusting the price Trina paid for tin ribbon "based on the difference in price between {Trina}'s purchases of other inputs from the same affiliated party and its purchase of those inputs from non-affiliated suppliers." Alliance Br. at 21-22. However, this argument overlooks Commerce's approach, where if an affiliated party provides multiple inputs, Commerce relies on the difference between the transfer and market price for inputs with market values to calculate the adjustment for the input without a market value. IDM at 29-30. In *LWR from Mexico*, for

example, Commerce faced the same fact pattern: a respondent received administrative services and hot-rolled coil from an affiliated party, and the affiliate did not provide the same administrative services to a third party, so there was no market price for the services from that affiliate. *See LWR from Mexico* IDM at 14. Commerce proceeded by performing an analysis based on the Transactions Disregarded Rule for the respondent's purchases of hot-rolled coil from the same affiliate comparing them to prices paid for hot-rolled coil from unaffiliated companies, and based on that testing, extrapolated the results of the transaction disregarded analysis of hot-rolled coil purchases from the same affiliate to the fees for administrative services provided to respondent by the same affiliate. *Id.* at 14-15. Similarly to the respondent in *LWR from Mexico* that received two inputs from an affiliated party, Trina purchased aluminum frames, EVA, and junction boxes from the same affiliated supplier that provided the tin ribbon and also from unaffiliated parties. *Id.*; IDM at 29-30. Thus, relying on the same approach under the Transactions Disregarded Rule, Commerce was able to extrapolate a market value for tin ribbon based on Trina's own purchases of other inputs from the same affiliated party and from unaffiliated parties. IDM at 30.

*2.* Alliance contends that Commerce erred in relying on *LWR from Mexico* because that proceeding involved services provided by an affiliated party, rather than a raw input. Alliance Br. at 22. However, Alliance does not explain why Commerce must treat inputs constituting services differently from inputs constituting goods. *Id.*; IDM at 29-30. Rather, regardless of whether an input is a good or a service, the transactions disregarded analysis operates in the exact same manner. Moreover, Alliance misconstrues Commerce's actual practice under the Transactions Disregarded Rule, where Commerce compares the transfer price

to market price, and the statute grants Commerce the authority to identify a market price based on the available information.

Relatedly, Alliance contends that in *LWR from Mexico*, Commerce "d{id} not have a market price" for the services at issue on the record. Alliance Br. at 22. This claim does not render *LWR from Mexico* incomparable to the facts here, because Trina did not have a market price for tin ribbon resulting from a transaction with an unaffiliated buyer. IDM at 29-30. However, the record has prices of transactions between Trina and unaffiliated buyers for aluminum frames, EVA, and junction boxes, as well as prices of the same inputs purchased from Trina's affiliate. *Id.* Because Commerce has the market values for the other three inputs from the same affiliated party and unaffiliated parties, Commerce reasonably extrapolated the market value to tin ribbon. *Id.* Alliance would add an unnecessary requirement to Commerce's methodology by requiring it to immediately seek alternative data sources from respondent's own purchases to value market price when an input does not have a market value immediately available. However, Commerce's statutory obligation is to base the market price on information available "as to what the amount would have been if the transaction had occurred between persons who are not affiliated." 19 U.S.C. § 1677b(f)(2). Commerce was able to extrapolate a market price using Trina's own purchases of inputs from the same affiliated buyer and from unaffiliated parties, such that the value accurately reflects an amount that "would have been if the transaction occurred between persons who are not affiliated." *Id.* Consequently, Commerce was not required to resort to the use of publicly available data to determine the market price for tin ribbon. In sum, Commerce's determination that an extrapolation from respondent's "own purchases" was accurate and consistent with its practice such that it did "not find it necessary to

resort to the use of publicly available data," IDM at 30, was a perfectly reasonable choice given the data on the record, and Alliance provides no reason for the Court to disturb that choice.

*3.* Although Alliance argues that Commerce considered the Thai import data as representative of market value for other inputs, *i.e.,* solar wafers, for purposes of Major Input Rule under 19 U.S.C. § 1677b(f)(3), Alliance fails to explain why Commerce is required to conduct the same analysis for tin ribbon for purposes of Transactions Disregarded Rule under 19 U.S.C. § 1677b(f)(2). Here, Commerce was able to determine the market price for tin ribbon because the supplier of tin ribbon supplied multiple inputs to Trina and Trina also purchased some of the same inputs from unaffiliated suppliers. IDM at 28-29.

*4.* Finally, Alliance asserts that Commerce wrongfully used purchases from unaffiliated NME suppliers in its transactions disregarded analysis. Alliance Br. at 32-33. Alliance notes that Commerce's recognition that NME prices do not reflect market value consequently bar Commerce from using the NME unaffiliated supplier transactions under Commerce's transactions disregarded analysis. *Id.* Alliance is mistaken. Regardless of whether a particular supplier is located in market economy country or NME, Trina purchased all these inputs in Thailand, a market economy country. Commerce addressed this issue directly, explaining that the market for the inputs, *i.e.*, aluminum frames and junction boxes, was not distorted, and there was no evidence on the record to find that the prices from the unaffiliated suppliers "are an unreasonable reflection of production and sale of the products." IDM at 30. The IDM cited *Diamond Sawblades and Parts Thereof from the Republic of Korea*, where Commerce determined not to adjust the respondent's reported costs because they purchased a certain limited number of inputs to the merchandise under consideration from unaffiliated producers who operate in NME countries. *See Diamond Sawblades from Korea* IDM at 40.

After reviewing the percentage that the certain inputs represented of the respondent's COP and comparing NME prices to either market-based prices or the COP for the input, Commerce determined that the use of such prices "did not result in an unreasonable reflection of the cost associated with the production and sale of the merchandise." *Id.* Thus, Commerce concluded both (A) that the market for the inputs was not distorted and (B) that the inclusion of NME unaffiliates supplier transactions was consistent with its past practice. IDM at 30.

Taken together, the Alliance's arguments fail to demonstrate that Commerce's Transactions Disregarded analysis was unsupported by substantial evidence.

## IV. Commerce's Determination That a Cost-Based PMS Exists in Thailand Is Supported by Substantial Evidence and In Accordance with Law

Commerce properly considered record information indicating distortions in the costs of wafer and solar glass particular to Thailand and affirmatively determined the existence of a cost-based PMS. Plaintiffs argue that Commerce improperly weighed record evidence in both determining the existence of distortions in the Thai solar inputs market and in adjusting for those distortions. Trina Br. at 19-45. CSIL also asserts that Commerce failed to provide a meaningful opportunity to comment. CSIL Br. at 10-15. As demonstrated below, plaintiffs' arguments are without merit.

### A. Legal Framework

Under section 773 of the Tariff Act of 1930, as amended (the Act), in determining whether subject merchandise is sold at less than fair value, "a fair comparison shall be made between the export price or constructed export price and normal value." 19 U.S.C. § 1677b. In calculating normal value, Commerce has the statutory authority to disregard reported prices in

the home and third country markets when a PMS in the exporting country or third country prevents a proper comparison.

Section 504 of the Trade Preferences Extension Act (TPEA) of 2015 added language to sections 771(15) and 773(e) of the Act that expressly introduces the concept of a PMS into statutory the provisions defining ordinary course of trade and CV. Specifically, section 771(15) allows Commerce to deem certain sales and transactions to be outside the ordinary course of trade when the PMS "prevents a proper comparison with the export price or constructed export price." 19 U.S.C. § 1677(15). Such distortions in sales prices, also known as sales-based PMS, affect "whether Commerce may rely on home-market sales data for normal-value comparisons." *Ellwood City Forge Co. v. United States*, 841 F. Supp. 3d 104, 113 (Ct. Int'l Trade 2026) (*Ellwood II*).

In addition to adding "PMS" to the definition of the term "ordinary course of trade," the TPEA amended section 773(e) of the Act by adding the concept of a "PMS" to the definition of CV. This amendment expressly permits Commerce's usage of an alternative calculation methodology to calculate CV when "the {COM} and fabrication or other processing of any kind does not accurately reflect the {COP} in the ordinary course of trade." 19 U.S.C. § 1677b(e); *see also NEXTEEL Co., Ltd. v. United States*, 28 F.4th 1226 (Fed. Cir. 2022) (*NEXTEEL II*). Such distortions in production costs constitute a cost-based PMS. *See Ellwood II*, 841 F. Supp. 3d at 130.

The statute does not define a PMS beyond requiring Commerce to show that sales or production costs are not within the ordinary course of trade. *Id.* at 5. While a PMS is not statutorily defined, Federal Circuit precedent and Commerce's regulations provide guidance in determining whether a PMS exists. In light of the Federal Circuit's decisions in *NEXTEEL II*

and *Hyundai Steel Co.* v. *United States*, 19 F.4th 1346 (Fed. Cir. 2021), Commerce promulgated a series of regulations "revising some of its procedures, codifying certain areas of its practice, and enhancing certain areas of its methodologies and analyses to address price and cost distortions." *Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 89 Fed. Reg. 20766 (Dep't of Commerce March 25, 2024). Commerce's regulations define a PMS as a circumstance or set of circumstances that: (1) prevents or does not permit a proper comparison of sales prices in the home market or third country market with export prices or constructed export prices; or (2) contributes to the distortion of the COM and fabrication or other processing of any kind, such that the COP of merchandise subject to an investigation does not accurately reflect the COP in the ordinary course of trade. 19 C.F.R. § 351.416(a).

In evaluating a cost-based PMS allegation, regulations dictate that Commerce must first establish the existence of a market situation. Commerce may determine a market situation exists when:

> (i) A circumstance or set of circumstances existed that may have impacted costs of producing subject merchandise, or costs or prices of inputs into the production of subject merchandise;
>
> (ii) The cost of materials and fabrication or other processing of any kind, including the prices of inputs used to produce subject merchandise, were not in accordance with market principles or distorted, and therefore did not accurately reflect the {COP} of subject merchandise in the ordinary course of trade; and
>
> (iii) The circumstance or set of circumstances at issue contributed to the distortion of the {COP} of subject merchandise.

19 C.F.R. § 351.416(d)(1). These factors are satisfied if it is more likely than not that the circumstance contributed to the distortion in the COP for the subject merchandise during the period of investigation or review. 19 C.F.R. § 351.416(d)(2); *see also Ellwood II*, 841 F. Supp. 3d at 115-16.

Next, Commerce will determine the market situation is *particular* if it "impacts prices or costs for only certain parties or products in the subject country." 19 C.F.R. § 351.416(e)(1); *see also NEXTEEL II*, at 1234 ("the circumstances supporting a 'particular' market situation also must be 'particular' to producers of the subject merchandise during the relevant period") (citing *SeAH Steel Corp. v. United States*, 513 F. Supp.3d 1367, 1393 (Ct. Int'l Trade 2021) (*SeAH*)). Commerce is not precluded from finding a PMS if distortions cannot be precisely quantified. 19 C.F.R. § 351.416(d)(4); *see also NEXTEEL II*, at 1234. Pursuant to its regulations, Commerce may still find a market situation to be particular even if it exists in multiple countries or markets. 19 C.F.R § 351.416(e)(1)(ii); *see also Husteel Co., Ltd. v. United States*, 426 F. Supp.3d 1376, 1391 (Ct. Int'l Trade 2020). If a market situation is found to be particular, Commerce may adjust its calculations of COP when determining CV. 19 C.F.R. § 351.416(f).

Commerce's regulations also provide a non-exhaustive list of situations that may distort the COP. *See* 19 C.F.R. § 351.416(g). One such distortion is the overcapacity of a significant input in international markets. *See* 19 C.F.R. § 351.416(g)(1). The lack of precise quantifiable data showing a distortion does not preclude Commerce from finding a cost-based PMS. *See* 19 C.F.R. § 351.416(d)(4).

**B. Commerce's Weighing of Record Evidence in Finding Distortions in Thailand's Solar Inputs Market Is Supported by Substantial Evidence and In Accordance with Law**

Commerce properly weighed record evidence in finding a distortion in Thailand's solar inputs market in accordance with its statutory obligations under 19 U.S.C. § 1677b(e). Plaintiffs contend that Commerce did not make the statutorily required finding that solar input costs were outside the ordinary course of trade. *See* Trina Br. at 19-26, 35-39. Further, Trina posits that Commerce improperly weighed record evidence in reaching its cost-based PMS determination. *See id.* at 21. As shown below, Commerce sufficiently evaluated all record information and properly found that substantial evidence showed the cost of solar inputs in Thailand was outside the ordinary course of trade.

Pursuant to the TPEA's amendments to 19 U.S.C. § 1677b(e), Commerce may use "any other calculation methodology" to calculate CV "if a {PMS} exists such that the {COM} and fabrication or other processing of any kind does not accurately reflect the {COP} in the ordinary course of trade," otherwise known as a cost-based PMS. As previously detailed, 19 C.F.R. § 351.416 outlines the requisite record information needed for Commerce to determine the existence of a cost-based PMS.

In evaluating the record, the lack of precise quantifiable data relating to distortions does not preclude Commerce from finding a cost-based PMS. *See* 19 C.F.R. § 351.416(d)(4); *see also NEXTEEL II*, at 1234 ("Nothing in the statute requires Commerce to quantify the distortion precisely."). Further, regulations provide a non-exhaustive list of examples where circumstances may distort production costs. *See* 19 C.F.R. § 351.416(g). Among these examples are the overproduction of a significant input of the subject merchandise. *See id.* § 351.416(g)(1).

In this investigation, that China-sourced wafers and solar glass dominated the Thai market for these inputs into solar cells. Post-Prelim at 16 (citing PMS Allegation at 5-11, and noting that "China accounted for over 95 percent of wafer imports and 80 percent of solar glass imports into Thailand during the POI"). Commerce also found that Chinese wafer and solar glass companies are state-owned. *Id.* Based on this information, Commerce found that a circumstance or set of circumstances existed that may have particularly impacted the costs of wafer and solar glass inputs into the production of solar cells. *Id.* (citing 19 C.F.R. § 351.416(d)(1)(ii)-(iii) and 19 C.F.R. § 351.416(d)(2).) Commerce further compared Trina's prices in purchasing solar inputs in Thailand to world market prices and found that Trina's prices were substantially lower, indicating that the cost of inputs used to produce Thai solar cells is distorted, and therefore does not accurately reflect the cost in the ordinary course of trade. *Id.* at 20. Finally, Commerce found "that China's dominance of the solar cell input market in Thailand and China's status as an NME country are more likely than not to have contributed to the identified distortion of the price for solar cell inputs in Thailand." *Id.* (citing 19 C.F.R. § 351.416(d)(1)(iii)). Thus, Commerce lawfully determined "that a market situation existed during the POI such that the cost of materials and fabrication does not accurately reflect the cost of production in the ordinary course of trade." *Id.*

In response, Trina contends that Commerce's finding that the COP of solar inputs did not reflect the ordinary course of trade because Commerce failed to consider Trina's sourcing of solar inputs, arguing that is purchase prices were not distorted because Trina sourced its polysilicon from non-China sources and the majority of its solar glass from non-Thai and non-China sources. Trina Br. at 19-26, 35-39. This argument is without merit for two reasons. First, a PMS finding is centered on the subject country's *market*, not any individual producer. *See*

*Husteel*, at 1390 ("To establish the existence of a PMS, Commerce must demonstrate…that there are distortions present *in the market*.") (emphasis added). Neither statute nor regulation requires Commerce to cater its PMS findings to a specific producer. Next, contrary to Trina's claim, Commerce did find that solar input prices in Thailand were distorted such that the COP of CSPV cells did not accurately reflect the COP in the ordinary course of trade. *See* IDM at 37-39.

Trina's further argument that its sourcing experience is representative of the Thai market as a whole is also meritless. Trina Br. at 25-26, 38-39. First, the argument that Trina's sourcing pattern for solar inputs is representative of the entire Thai solar industry is contradicted by record evidence showing that "China accounted for over 95 percent of wafer imports and 80 percent of solar glass imports into Thailand during the POI." IDM at 38 (citing PMS Allegation at 6-7). As Commerce explained, its analysis is not limited to solely Trina's experience as the prices that Trina paid for wafers and solar glass in Thailand reflect the larger market conditions in Thailand for those inputs in a market dominated by Chinese imports of wafers and solar glass that accounted for the overwhelming majority of the market. *Id.* at 39. Also, with respect to glass, Trina's argument that its purchase prices were not distorted due to Chinese overcapacity is contradicted by its acknowledgement that some of its purchases of solar glass came from China sources. Trina Br. at 37. Thus, given that Trina itself had Chinese input suppliers, it is reasonable to conclude that other Thai solar producers had Chinese input suppliers, particularly given that China dominated imports of such inputs into Thailand during the relevant period, and that the overcapacity of these inputs from China had a distortive effect on the Thai market as a whole.

Second, Commerce need not find that Trina and the rest of the Thai solar producers sourced solar inputs directly from China, but rather that the set of circumstances existed such that

the price of solar inputs in Thailand was distorted and outside the ordinary course of trade. 19 C.F.R. § 351.416(d). To that end, Commerce found that "China's dominance of the solar input market in Thailand likely contributes to a decline in the price for solar cell inputs below what the market-determined price is for inputs sold outside China." IDM at 47. As a result, Commerce's determination focused on Chinese influences on the market for inputs as a whole. Necessarily, then, Commerce determined that the market for inputs as a whole is impacted by Chinese inputs, impacting Trina's inputs regardless of whether they were sourced from China. *See* IDM at 39. Therefore, taken together, Trina has failed to show Commerce's PMS determination was unsupported by substantial evidence.

### C. Commerce's Finding That Distortions in Solor Input Prices Were Particular to Thailand Is Supported by Substantial Evidence and In Accordance with Law

Commerce properly exercised its authority under 19 U.S.C. § 1677b(e) in finding that distortions in solar input prices were particular to Thailand. Trina challenges Commerce's cost-based PMS finding by alleging that Commerce failed to satisfy the requirement for particularity. While particularity is not statutorily defined, this Court, the Federal Circuit, and Commerce's regulations outline factors that may establish particularity. As demonstrated below, these authorities demonstrate that Commerce's finding of particularity in the present case was supported by the record and in accordance with the statute. Trina's challenge is therefore without merit.

The statute does not define the requisite degree of particularity for a PMS to exist. *See NEXTEEL*, at 1234; *see also Ellwood II*, 841 F. Supp. 3d at 115 ("The statute does not define {PMS} other than to require a showing that either the sales made, or the production costs incurred, are outside the ordinary course of trade.") In giving weight to the word "particular" in

§ 1677(e), the Federal Circuit has stated that a PMS "must be particular to producers of the subject merchandise during the relevant period." *NEXTEEL II*, at 1234 (citing *SeAH*, at 1393). Commerce codified this holding in 19 C.F.R. § 351.416(e), which provides that particularity is satisfied if a market situation impacts prices or costs for only certain parties or products in the subject country. While an ongoing global phenomenon by itself would not constitute a deviation from the ordinary course of trade, a market situation may exist in more than one market without barring a finding of particularity. *See Husteel*, at 1391 (stating that the statute "may not demand that a PMS be such that it only affects the subject market"). Echoing *Husteel*, Commerce's regulations state that the same market situation may exist in multiple countries and still be considered particular provided it distorts the costs for only certain parties or products in the subject country. 19 C.F.R. § 351.416(e)(1)(ii). The regulations further specifically list overcapacity of a significant input in international markets as an example of a cost-based PMS. 19 C.F.R. § 351.416(g)(1).

Here, contrary to Trina's arguments, the record provides substantial evidence of the low-priced Chinese solar inputs impact on the subject market in particular, in addition to Chinese global influence. Trina Br. at 26-28. As noted above, Commerce considered evidence of an increase of Chinese solar input imports coinciding with a decrease in Thailand's domestic solar input prices. *See* IDM at 37-39. Additionally, Commerce considered record evidence showing imported Chinese solar inputs were cheaper than solar input imports from all other countries and Thailand's domestic market. *See id*.

Thus, following the promulgation of 19 C.F.R. § 351.416 and in contrast to *Husteel* and *NEXTEEL* where based on specific facts on the record of those cases the courts found that Commerce failed to show that the effect Chinese overcapacity was particular to the Korean HRC

market, Commerce found that "China accounted for over 95 percent of wafer imports and 80 percent of solar glass imports into Thailand during the POI" and that prices that Trina paid for these inputs in Thailand were substantially lower than the world market prices of these inputs. Post-Prelim at 16. A combination of increasing Chinese solar inputs imports, the dominant position of Chinese inputs in the Thai market, decreasing domestic solar input prices, the disparity between prices in the Thai market and world prices, provided substantial evidence of particularity. *Compare id. with Husteel*, *and NEXTEEL*. *See also* 19 C.F.R. § 351.416(e)(ii) (clarifying that the "same or similar market situations can exist in multiple countries or markets and still be considered particular"). This data and analysis is more than sufficient "evidence as a reasonable mind might accept as adequate to support" Commerce's conclusion that the particularity requirement is met here. *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938). Given the record evidence cited by Commerce, it is reasonable for Commerce to find that this market situation was particular to Thailand.

### E. Commerce Provided a Meaningful Opportunity for the Parties to Comment on the PMS Determination

In addition to incorporating Trina's arguments, CSIL argues that Commerce failed to provide a meaningful opportunity to comment on its PMS findings due to the issuance of the post-prelim analysis following submission of general case briefs. CSIL Br. at 9-14. This argument is without merit. First, after releasing its preliminary PMS findings on Mach 24, 2025, Commerce received PMS specific case briefs from Trina and CSIL as well as a letter in lieu of a case brief from the petitioner on March 31, 2025. IDM at 3. On April 4, 2025, Commerce received rebuttal briefs from Trina and the petitioner and a letter in lieu of a rebuttal brief from CSIL. *Id.* After reviewing the record and the argument raised by the parties, Commerce

released its final determination on April 21, 2025. *Id.* Thus, based on this timeline and the record, Commerce provided a meaningful opportunity to comment and interested parties, including CSIL, availed themselves of that opportunity.

Additionally, "Commerce enjoys considerable discretion in the conduct of its administrative proceedings." *See JBF RAK LLC v. United States*, 991 F. Supp. 2d 1343, 1352 (Ct. Int'l Trade 2014) (*JBF RAK*) (holding that JBF RAK was not prejudiced by Commerce's issuance of a post-prelim since "Commerce gave the parties an opportunity to file comments on its *Post-Preliminary Determination* and still managed to issue the *Final* Results within the statutory time-frame"). The Federal Circuit has stated that "{a}bsent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." *PSC VSMPO*, 688 F.3d at 760 (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Counsel, Inc.*, 435 U.S. 519, 543-44 (1978)). Similarly, the parties in this proceeding were able to provide both comments and rebuttal comments and, thus, were not prejudiced by this reasonable exercise of agency discretion. *See JBF RAK*, 991 F. Supp. 2d at 1352 (citing *Timken Co. v. United States*, 968 F. Supp.2d 1279 (Ct. Int'l Trade 2014)).

When reviewing Commerce's determination, "the court may not substitute its judgment for that of the {agency} when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Goldlink*, 431 F. Supp.2d at 1326 (citation modified). "{T}he possibility of drawing two inconsistent conclusions from the evidence" does not preclude Commerce's determination from being supported by substantial evidence. *Consolo*, 383 U.S. at 620. Commerce's regulations

require Commerce to "weight the information on the record and determine whether it is more likely than not that the circumstance or set of circumstances contributed to the distortion in the {COP} of subject merchandise during the {POI or POR}, and therefore, that a market situation existed during that period." 19 C.F.R. § 351.416(d)(2). As demonstrated above, Commerce was within its discretion to determine that, after weighing all record information, substantial record evidence supports a cost-based PMS finding.

**F. Commerce's PMS Benchmark Selection for Solar Wafers Was Supported by Substantial Evidence**

Commerce explained its use of global price data for HS 3818.00 as the benchmark for its PMS analysis. It explained that "{g}iven the nature of the PMS allegation," IDM at 49, namely that "less-than-fair-value imports of critical solar inputs from China dominate the Thai market," Post-PDM at 2, "the HS 3818.00 price data permit the exclusion of both Cina and Thailand in terms of both the source and destination of the wafers," IDM at 49. Other aspects of the dataset rendered it superior to the others, namely the fact that "the HS data are expressed in kilograms, which avoids concerns related to conversion of watts or pieces into kilograms," and the fact that it "reflects a broad market average." *Id.* Commerce acknowledged Trina's argument that "HS 3818.00 contains highly dissimilar products from wafers," but noted "that the category includes the input at issue (i.e., wafers)." *Id.* Commerce ultimately concluded that the benefits discussed above, "on balance, outweigh concerns about whether the HS subheading 3818.00 category, including wafers, may include other products, or data for non-solar producing countries." IDM at 50. Thus, Commerce fully explained its reasoning for why the HS 3818.00 data was "the best data on the record for its analysis." IDM at 49.

Trina contends that the HS 3818.00 data "is itself distortive and is significantly out of line with every other benchmark on the record that is specific to solar wafers." Trina Br. at 35. However, as discussed in additional detail below, Commerce considered other sources of data proposed by the parties, but concluded that they all had deficiencies that rendered them unreliable. Put differently, for each of the other comparison points Trina identified, Commerce concluded that they were insufficient. Thus, it is irrelevant that the HS 3818.00 price data was higher than the other proposed sources, because those sources suffered other kinds of deficiencies.

With respect to Hanwha, as Commerce concluded, its pricing data "contain China produced wafer prices," meaning that "they do not reflect prices paid for the same input under market-based circumstances as required by" 19 C.F.R. § 351.416(d)(3)(i). IDM at 49. Trina does not dispute this conclusion, but rather contends that, in a different proceeding, Commerce relied on Hanwha's costs of production data to calculate its constructed value 19 U.S.C. § 1677b. Trina Br. at 32 (citing *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Malaysia: Affirmative Preliminary Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 96,207 (Dep't of Commerce Dec. 4, 2024), and accompanying Preliminary Decision Memorandum, at 22). But Commerce may come to different conclusions in different proceedings based on the record of each proceeding. *See Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014) ("each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record"). And not only did that separate proceeding involve separate record facts, it used the data for a completely different purpose with different regulatory requirements. Here, Commerce concluded that it could not rely on the Hanwha data set because it did not reflect "*market-based*

*circumstances*." IDM at 49 (citing 19 CFR 351.416(d)(3)(i)) (emphasis in original). The requirements for using costs of production in calculations of constructed value contain no similar market-based requirement. *See* 19 U.S.C. § 1677b(3). Therefore, Commerce's use of data for a different calculation in a different proceeding cannot demonstrate error in its use of data here.

Moreover, Trina faults Commerce for noting that the Hanwha data does not "reflect a broad international price." Trina Br. at 32 (citing IDM at 49). But, as discussed above, that was not Commerce's only reason for rejecting the Hanwha data. And in any event, nothing in the regulation prohibits Commerce from preferring datasets that reflect broad international prices when seeking prices for the input "either in the home country or elsewhere." 19 C.F.R. § 351.416(d)(3)(i). Rather, the regulation's reference to both "home country" and "elsewhere" suggests that a broad dataset is entirely appropriate. Trina has therefore failed to show that Commerce's rejection of the Hanwha data set was unsupported by substantial evidence.

With respect to TrendForce, Commerce explained that it "did not rely on the TrendForce pricing dataset because it is missing price data for almost half of the months of the POI and Commerce was unable to determine based on the record whether the TrendForce prices exclude Chinese production or reflect prices of sales to China." IDM at 49. However, Trina addresses only the second half of Commerce's reasoning—Trina fails to contest the fact that the TrendForce data was missing price data for *almost half* of the months of the POI. *Id.* This alone supports Commerce's rejection of the TrendForce data.

Trina also alleges that Commerce "unreasonably perceived ambiguity" in concluding that it could not determine whether the "TrendForce prices exclude Chinese production or reflect prices of sales to China." IDM at 49. Commerce identified Trendforce's reference to "the data as 'out of China'" as ambiguous, possibly indicating the data included the prices of sales to

China. Post-PDM at 16. Although Trina contends that the TrendForce data does exclude prices from China, Trina Br. at 33-34, its arguments boil down to mere disagreement with Commerce's conclusions about the ambiguity of the TrendForce data, which is insufficient to disturb Commerce's conclusion.

With respect to CEA, Trina contends that Commerce's conclusion that CEA's "sales prices are based on all markets in Southeast Asia, which presumably could include China, and the data do not specify whether China prices were included" is erroneous. Trina Br. at 34. But that was not the only reason for Commerce's rejection of the CEA data. Commerce also concluded that "the CEA pricing data are based on market forecasting, not actual prices." Post-PDM at 18. Commerce's rejection of the CEA data is therefore supported by substantial evidence.

With respect to the Datamyne and Volza data, Trina contends that Commerce failed to explain why it did not use these data sources as a benchmark. Trina Br. at 35. However, Commerce explained its rejection of these sources in its post-preliminary decision memo:

> With regard to Descartes Datamyne and Vietnam import statistics from Volza, we find the pricing data unusable for our PMS analysis. Both Descartes Datamyne and Volza import data for Vietnam do not reflect broad average international prices as they relate to wafer prices in Vietnam and Malaysia, respectively. Further, while these prices are POI-specific and do not include Chinese wafer production, they are based on bill of lading (BOL) data, which Commerce has rejected in multiple proceedings. In those proceedings, Commerce found that the BOL data is not the best source of data to use compared with other available sources. Accordingly, we find the Descartes Datamyne and Vietnam import statistics from Volza prices not the best wafer prices for our PMS analysis.

Post-PDM at 17 (citations omitted). Trina does not challenge any of these conclusions in its brief, meaning it has failed to show that they are unsupported by substantial evidence.

Taken together, Commerce fully explained its rationale for not relying on the alternative data sources Trina identifies, and Commerce's reasoning was supported by substantial evidence.

### G. Commerce's PMS Benchmark Selection for Solar Glass was Supported by Substantial Evidence

As with solar wafers, Trina contends that Commerce's determination to use HTS 7007.19.80 data as a benchmark for solar glass was unsupported by substantial evidence because the category includes dissimilar products. Trina Br. at 39-40. But, as with solar wafers, Commerce acknowledged this fact and explained why the dataset was nevertheless the best on the record, explaining that "{t}his HS subheading reflects solar glass prices from many countries, identifies the producing and importing country, and excludes solar glass prices into and out of China and Thailand. Thus, we conclude, on balance, that the characteristics of EU prices for solar glass under HS 7007.19.80 outweigh the possibility that the data source may include some prices for products other than solar glass." IDM at 51. Although Trina contends that Commerce unreasonably rejected the alternative sources for solar glass benchmarks, those arguments fail to demonstrate that Commerce's conclusions were unsupported by substantial evidence.

With respect to the PV Insights data, Trina contends that Commerce's conclusion that the data included China-produced solar glass and it failed to report pricing on a per-kilogram basis is inaccurate. Trina Br. at 19. However, Commerce laid out this reasoning in its post-PDM memorandum. *See* Post-PDM at 19. Moreover, Trina's contentions that "Commerce's rejection of the PV Insights data here contradicts years of precedence in solar proceedings" is of no moment. As we explained above, each administrative review is its own proceeding with its own

record, and Commerce must make its determination based on the record of each individual proceeding. *See Qingdao Taifa Group Co.*, 780 F. Supp.2d at 1350 ("Commerce is not required to justify its determination in terms of past alternatives.").

With respect to the TDM and Import Genius import data from Turkey, Commerce explained that it "did not use those prices because they reflected market conditions for a single country whereas the prices under HS 3818.00{[2]} reflected a broad market average." IDM at 51; *see also* Post-PDM at 19 ("Import Genuis and Royal Thai Government data are comprised of sales to only a single country, Turkey and Thailand, respectively."). Trina argues that this choice of data was unsupported because "solar inputs are produced in only a handful of markets" meaning that "data from a country that is a demonstrated solar glass producer is far more product-specific and reliable as a PMS comparison benchmark." Trina Br. at 44. However, Commerce decided that data reflecting a broader market average was better than more specific data that was from only a single country. *See* IDM at 51; Post-PDM at 19. Trina's disagreement with that assessment does not render it unsupported by substantial evidence. Rather, "{t}his court's duty is not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Zhejiang Dunan Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (citation modified).

Commerce's choice to value broader market data over more specific data from a single country was a reasonable choice for the best available information, especially considering

[2] As Trina notes, Commerce here incorrectly referenced HS 3818.00, the code for solar wafer adjustments, rather than HS 7007.19.80, the code for solar glass adjustments. *See* Trina Br. at 43 n. 17.

Commerce's preference for international prices. *See* IDM at 20 (citing *Diamond Sawblades and Parts Thereof from the People's Republic of China; Final Results of Antidumping Duty Administrative Review; 2012–2013*, 80 Fed. Reg. 32344 (Dep't of Commerce June 8, 2015), and accompanying IDM at Comment 5). Although Trina correctly notes that the regulations instruct Commerce to make a comparison to the "same input," Trina Br. at 44 (citing 19 C.F.R. § 351.416(d)), Trina does not contest that HS 7007.19.80 includes the product at issue. Moreover, even under Trina's read of the record, the Turkey data would exclude two EU countries' productions of solar glass that is captured under HS 7007.19.80. *See* Trina Br. at 44 (noting "three EU countries produce solar glass."). Therefore, Commerce's choice to not rely on the Turkish data was reasonable and supported by substantial evidence.

Taken together, because Commerce explained its reasoning for relying on HS 7007.19.80 data as the benchmark for solar glass, and because it reasonably concluded that the other proposed sources of data were not the best available information, Commerce's choice was supported by substantial evidence.

## V. Commerce's PMS Adjustment is Supported by Substantial Evidence and is in Accordance with Law

Commerce's decision not to adjust PMS benchmarks to include movement-related expenses was supported by substantial evidence and in accordance with law.

The statute provides that "if a {PMS} exists such that the {COM} and fabrication or other processing of any kind does not accurately reflect the {COP} in the ordinary course of trade, {Commerce} may use another calculation methodology under this subtitle or any other calculation methodology." 19 U.S.C. § 1677b(e)(3). Pursuant to 19 C.F.R. § 351.404(c)(2)(i), Commerce may decline to calculate normal value based on the price of the subject merchandise

in the exporting country when a PMS exists that prevents the proper comparison of home market price with export price. When the record does not support a proper comparison, Commerce may determine that CV may be used as the basis for calculating normal value. 19 C.F.R. § 351.404(c)(2)(i). Additionally, "{i}f, after consideration of the information on the record, {Commerce} is unable to precisely quantify the distortions to the cost of production of subject merchandise in the ordinary course of trade to which the particular market situation has contributed, {Commerce} may use any reasonable methodology based on record information to adjust its calculations to address those distortions." 19 C.F.R. § 351.416(f)(2). Moreover, Commerce's regulations explain that that "{w}hatever methodology Commerce employs to determine the appropriate adjustment . . . will be case-specific and depend on the facts of the record and what information is provided to Commerce for purposes of making an adjustment." *Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 89 Fed. Reg. at 20808 (March 25, 2024). "Where the statute does not prescribe a particular benchmark, Commerce's methodological choices—including the selection of a benchmark dataset—are entitled to deference so long as they are reasonable." *Ellwood II*, 841 F. Supp. 3d at 118. "On *factual issues*, the court's role is not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Id.* (quoting *Dorbest Ltd. v. United States*, 462 F.Supp.2d 1262, 1268 (Ct. Int'l Trade 2006)).

Alliance challenges this determination, arguing that "Commerce's determination not to adjust the PMS benchmarks for solar glass and wafers to include freight and other movement-related expenses is not supported by substantial evidence." Alliance Br. at 15-20. Alliance's

arguments, however, amount to mere disagreement regarding the information Commerce concluded was the best available, which is insufficient to show Commerce's determination was unsupported by substantial evidence. For instance, Alliance challenges Commerce's analysis of the ocean freight data. Alliance Br. at 17. But Commerce found that ocean freight data submitted by the petitioner was not suitable for comparison because it "only reflect{ed} shipping costs from the United States to Thailand, despite the fact that the PMS wafer benchmark reflects prices from several other countries in addition to the United States." IDM at 52 (citing Alliance PMS Rebuttal Brief and Alliance Solar Glass Submission). The fact that "the United States was the second largest export source included in the wafer benchmark data," Alliance Br. at 16, does not undermine Commerce's conclusion that the dataset as a whole was unrepresentative.

Likewise, Alliance challenge's Commerce's analysis of solar glass benchmark data. Alliance Br. at 18. However, Commerce noted that "the PMS benchmark for solar glass is comprised exclusively of prices from the European Union." *Id.* And in further explaining the reasoning for its adjustment, Commerce also found that no party submitted information for import duty rates for wafers and that Alliance's benchmark data for solar glass excluded data for Thailand. *Id.* Accordingly, after considering the available record information and the various difficulties in quantifying the distortions to the cost of production, including the deficiencies in the datasets identified by Alliance, Commerce' determination to adjust Trina's purchase prices for solar glass and wafers to address the PMS affecting these inputs was in accordance with law and supported by substantial evidence.

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiffs' and consolidated plaintiffs' motions for judgment on the administrative record and sustain Commerce's final determination.

Respectfully submitted,

JONATHAN D. GUYNN
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

/s/ Blake W. Cowman
BLAKE W. COWMAN
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 353-2494

*Attorneys for Defendant*

OF COUNSEL:

PAUL THORNTON
Attorney
Office of Chief Counsel
For Trade Enforcement & Compliance
Department of Commerce

November 17, 2026

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that defendant's motion in this matter complies with the Court's type-volume limitation rules and the Court's September 16, 2026 scheduling order (ECF No. 44). According to the word count calculated by the word processing system with which the motion was prepared, the brief contains a total of 16,106 words.

/s/ Blake Cowman

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the foregoing brief upon all counsel of record in this proceeding via a secure file-sharing service.

/s/ Blake Cowman